Brandy T. Cody, State Bar No. 196923
Email: bcody@fishisphillips.com
James C. Fessenden, State Bar No. 238663
Email: jfessenden@fishisphillips.com
FISHER & PHILLIPS LLP
4747 Executive Drive, Suite 1000
San Diego, CA 92121
Telephone: (858) 597-9600
Facsimile: (858) 597-9601

Christopher M. Ahearn, State Bar No. 239089
Email: cahearn@fisherphillips.com
FISHER & PHILLIPS LLP
2050 Main Street, Suite 1000
Irvine, CA 92614
Telephone: (949) 851-2424
Facsimile: (949) 851-0152

Sean F. Daley, State Bar No. 272493
Email: sdaley@fisherphillips.com
FISHER & PHILLIPS LLP
444 S Flower Street, Suite 1500
Los Angeles, CA 90071-2957
Telephone: (213) 330-4500
Facsimile: (213) 330-4501

Attorneys for Defendant
FEDEX GROUND PACKAGE SYSTEM, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERMAN OVERPECK and KEVIN STERLING, individually and on behalf of all others similarly situated, and as a proxy of the State of California on behalf of aggrieved employees,<br><br>        Plaintiffs,<br><br>        v.<br><br>FEDEX CORPORATION and FEDEX GROUND PACKAGE SYSTEM, INC.,<br><br>        Defendants. | Case No: 4:18-cv-07553-PJH (DMR)<br><br>**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: TBD<br>Time: TBD<br>Place: Oakland Courthouse<br>Courtroom: 3, 3rd Floor<br><br>Action filed: December 14, 2018 |

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ............................................................................................. iii

STATEMENT OF FACTS ................................................................................................ 2

    A.    FedEx Ground Contracts with Thousands of Independent Businesses to
        Provide Delivery Services Throughout the United States ............................................ 2

    B.    Service Provider Agreements Are Not Uniform ................................................. 3

    C.    Service Providers Decide How to Operate Their Businesses ....................................... 4

    D.    Service Providers Are Responsible for Complying with Labor Laws......................... 6

    E.    FedEx Ground Does Not Exercise Control Over Drivers.......................................... 7

    F.    Scanner Data Does Not Measure Compensable Time or Breaks ............................... 8

ARGUMENT .................................................................................................................... 8

I.    PLAINTIFFS AND CLASS COUNSEL ARE INADEQUATE
    REPRESENTATIVES ............................................................................................ 9

II.    PLAINTIFFS CANNOT SATISFY RULE 23(a)(2) COMMONALITY ............................ 11

    A.    Plaintiffs Cannot Prove Joint Employment With Common Evidence....................... 12

        1.    Plaintiffs Lack Common Evidence to Satisfy the "Control" Test ................. 12

        2.    Plaintiffs Lack Common Evidence for the "Suffer or Permit to Work"
             Test.......................................................................................................... 14

        3.    Plaintiffs Lack Common Evidence to Satisfy the "Engage to Work"
             Test.......................................................................................................... 14

    B.    Joint Employment Would Not Drive Resolution of Plaintiffs' Claims ..................... 16

    C.    Plaintiffs' Other "Common" Questions Would Not Drive Resolution of
        Claims .................................................................................................................... 17

III.    INDIVIDUAL LIABILITY AND DAMAGES ISSUES PREDOMINATE........................ 17

    A.    Individual Issues Dominate Plaintiffs' Meal and Rest Break Claims........................ 17

        1.    Evidence shows that break policies varied by Service Provider.................... 18

        2.    Whether a P&D Driver's Break Claims Are Preempted Is
             Individualized ......................................................................................... 22

Page(s)

      3.    Plaintiffs' Break Claims Present Individualized Damages Issues ................. 23

  B.    Individualized Issues Predominate for the Fraud and Conversion Claims ................ 24

  C.    Individualized Issues Predominate on Wage Statement Claims ................................. 25

  D.    Individual Issues Predominate the Derivative UCL Claim .......................................... 25

  E.    Plaintiffs Fail to Meet Predominance for Additional Reasons ................................... 26

      1.    The linehaul subclass raises individual choice-of-law issues ........................ 26

      2.    Individual issues predominate because some drivers signed arbitration agreements or already settled their claims ....................................................... 26

IV.    THE PROPOSED CLASS ACTION IS NOT SUPERIOR TO INDIVIDUAL OR SMALL GROUP ACTIONS AGAINST SERVICE PROVIDERS ...................................... 27

  A.    Individual or Group Actions Against Service Providers Is a Superior Option ........... 27

  B.    Plaintiffs' Proposed Class Action Is Unmanageable ................................................... 28

      1.    Plaintiffs propose no manageable way to try this case as a class action......... 28

      2.    Plaintiffs' proposed class presents ascertainability problems......................... 29

V.    THE P&D SUBCLASS FAILS TO SATISFY RULE 23(a)(3) TYPICALITY .................... 30

CONCLUSION ................................................................................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Akkerman v. Mecta Corp.*,
  152 Cal. App. 4th 1094 (2007) ................................................................................ 25

*Alberts v. Aurora Behavioral Health Care*,
  241 Cal. App. 4th 388 (2015) .................................................................................. 21

*Alexander v. FedEx Ground Package Sys.*,
  765 F.3d 981 (9th Cir. 2014) ................................................................................... 15

*Amato v. Bernard*,
  618 F.2d 559 (9th Cir. 1980) ................................................................................... 24

*Andren v. Alere, Inc.*,
  No. 16CV1255-GPC (AGS),
  2017 WL 6509550 (S.D. Cal. Dec. 20, 2017) ......................................................... 10

*Ayala v. Antelope Valley Newspapers, Inc.*,
  59 Cal. 4th 522 (2014) ...................................................................................... 14, 15

*Badella v. Deniro Mktg. LLC*,
  No. C 10-03908 CRB,
  2011 WL 5358400 (N.D. Cal. Nov. 4, 2011) ........................................................... 28

*Barefield v. Chevron, U.S.A., Inc.*,
  No. C 86-2427 TEH,
  1988 WL 188433 (N.D. Cal. Dec. 6, 1988) .............................................................. 29

*Benton v. Telecom Network Specialists, Inc.*,
  220 Cal. App. 4th 701 (2013) .................................................................................. 21

*Brewer v. Gen. Nutrition Corp.*,
  No. 11-CV-3587 YGR,
  2014 WL 5877695 (N.D. Cal. Nov. 12, 2014) ......................................................... 21

*Brinker Rest. Corp. v. Super. Ct.*,
  53 Cal. 4th 1004 (2012) ........................................................................................... 19

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ................................................................................. 30

*Burds v. Union Pac. Corp.*,
  223 F.3d 814 (8th Cir. 2000) ................................................................................... 24

*Campbell v. Best Buy Stores, L.P.*,
    No. LA CV12-07794 JAK,
    2013 WL 5302217 (C.D. Cal. Sept. 20, 2013) ............................................. 21

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ............................................................................... 8, 17

*Craig v. FedEx Ground Package Sys., Inc.*,
    335 P.3d 66 (Kan. 2014) ............................................................................ 15

*Cruz v. Sun World Int'l, LLC*,
    243 Cal. App. 4th 367 (2015) .................................................................... 17

*Currithers v. FedEx Ground Package Sys., Inc.*,
    No. 04-10055,
    2012 WL 458466 (E.D. Mich. Feb. 13, 2012) ......................................... 9-10

*Curry v. Equilon Enters., LLC*,
    23 Cal. App. 5th 289 (2018) ............................................ 12, 13, 14, 15

*Daniel F. v. Blue Shield of Cal.*,
    305 F.R.D. 115 (N.D. Cal. 2014) ......................................................... 24, 28

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ................................................................ 16-17

*Evans v. IAC/Interactive Corp.*,
    244 F.R.D. 568 (C.D. Cal. 2007) ............................................................. 11

*Forrand v. Fed. Express Corp.*,
    No. CV 08-1360 DSF PJWX,
    2013 WL 1793951 (C.D. Cal. Apr. 25, 2013) ....................................... 23-24

*Franklin v. Cmty. Reg'l Med. Ctr.*,
    No. 19-17570,
    2021 WL 2024516 (9th Cir. May 21, 2021) ............................................. 27

*Glidden v. Chromalloy Am. Corp.*,
    808 F.2d 621 (7th Cir. 1986) ...................................................................... 9

*Gonzales v. Officemax N. Am.*,
    No. SACV 07-00452 JVS
    2012 WL 5473764 (C.D. Cal. Nov. 5, 2012) ........................................... 21

*Green v. Fed. Express Corp.*,
    614 F. App'x 905 (9th Cir. 2015) .............................................................. 24

*Haley v. Medtronic, Inc.,*
　　169 F.R.D. 643 (C.D. Cal. 1996) ................................................................ 25, 29

*Henderson v. Equilon Enters., LLC,*
　　40 Cal. App. 5th 1111 (2019) ............................................................................. 15

*Heredia v. Eddie Bauer LLC,*
　　No. 16-cv-06236,
　　2020 WL 127489 (N.D. Cal. Jan. 10, 2020) ....................................................... 12

*In re FedEx Ground Package Sys., Inc. Emp't Practices Litig.,*
　　273 F.R.D. 424 (N.D. Ind. 2008) .................................................................. 15, 16

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869,*
　　725 F.3d 244 (D.C. Cir. 2013) ............................................................................ 30

*In re Wawa, Inc. Data Sec. Litig.,*
　　No. CV 19-6019,
　　2021 WL 2073758 (E.D. Pa. May 24, 2021) ...................................................... 15

*In re Wells Fargo Home Mortg. Overtime Pay Litig.,*
　　268 F.R.D. 604 (N.D. Cal. 2010) ........................................................................ 23

*Int'l Bhd. of Teamsters, Local 2785 v. Fed. Motor Carrier Safety Admin.,*
　　986 F.3d 841 (9th Cir. 2021) ............................................................................... 22

*Johnson v. Serenity Transp., Inc.,*
　　No. 15-cv-02004-JSC,
　　2017 WL 1365112 (N.D. Cal. Apr. 14, 2017) .................................................... 14

*Krueger v. Wyeth, Inc.,*
　　No. 03CV2496 JLS (AJB),
　　2008 WL 481956 (S.D. Cal. Feb. 19, 2008) ....................................................... 10

*Lane v. Francis Capital Mgmt. LLC,*
　　224 Cal. App. 4th 676 (2014) .............................................................................. 26

*Leyva v. Medline Indus. Inc.,*
　　716 F.3d 510 (9th Cir. 2013) ............................................................................... 24

*Marquez v. NLP Janitorial, Inc.,*
　　No. 16-cv-06089,
　　2019 WL 652866 (N.D. Cal. Feb. 15, 2019) ...................................................... 28

*Martinez v. Combs,*
　　49 Cal. 4th 35 (2010) ............................................................................ 12, 13, 14

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,
    No. 12-CV-04457-YGR,
    2016 WL 879784 (N.D. Cal. Mar. 8, 2016) ................................................................ 30

*Mejia v. Farmland Mut. Ins. Co.*,
    No. 2:17-cv-00570-TLN-KJN,
    2018 WL 3198006 (E.D. Cal. June 26, 2018) ........................................................... 25

*Moore v. Int'l Cosmetics & Perfumes, Inc.*,
    No. ED-CV 14–1179 DMG (DTBx),
    2016 WL 7638182 (C.D. Cal. Aug. 23, 2016) ........................................................... 26

*Moreau v. Air France*,
    356 F.3d 942 (9th Cir. 2004) ..................................................................................... 14

*Noel v. Thrifty Payless, Inc.*,
    7 Cal. 5th 955 (2019) ................................................................................................. 17

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    993 F.3d 774 (9th Cir. 2021) ................................................................................ 29, 30

*Ordonez v. Radio Shack, Inc.*,
    No. CV 10-7060-CAS JCGX,
    2013 WL 210223 (C.D. Cal. Jan. 17, 2013) .......................................................... 12-13

*Pavloff v. Cardinal Logistics Mgmt. Corp.*,
    No. CV 20-00363 PA (KKx),
    2020 WL 6821072 (C.D. Cal. Oct. 7, 2020) ................................................. 19, 22, 26

*Pearl v. Allied Corp.*,
    102 F.R.D. 921 (E.D. Pa. 1984) ................................................................................ 10

*Perry v. U.S. Bank*,
    No. C-00-1799-PJH,
    2001 WL 34920473 (N.D. Cal. Oct. 16, 2001) .......................................................... 17

*Pierce v. Cty. of Orange*,
    526 F.3d 1190 (9th Cir. 2008) ...................................................................................... 9

*Pina v. Con-Way Freight, Inc.*,
    No. C 10-00100 JW,
    2012 WL 1278301 (N.D. Cal. Apr. 12, 2012) ........................................................... 21

*Salazar v. McDonald's Corp.*,
    944 F.3d 1024 (9th Cir. 2019) ............................................................................. 12, 13

*Sales v. United Road Servs., Inc.*,
No. 19-cv-08404-JST,
2020 WL 4035072 (N.D. Cal. July 17, 2020)...............................................22

*Santos v. United Parcel Serv., Inc.*,
No. 3:18-cv-03177-EMC,
2020 WL 6784220 (N.D. Cal. Nov. 18, 2020) ..........................................20-21

*Seene v. Kansas City Royals Baseball Corp.*,
No. 14-CV-00608-JCS,
2015 WL 6152476 (N.D. Cal. Oct. 20, 2015)...............................................12

*Shaw v. AMN Healthcare, Inc.*,
326 F.R.D. 247 (N.D. Cal. 2018).................................................................21

*Soares v. Flowers Foods, Inc.*,
320 F.R.D. 464 (N.D. Cal. 2017).................................................................27

*Stockwell v. City & Cty. of S.F.*,
No. C 08-5180 PJH,
2015 WL 2173852 (N.D. Cal. May 8, 2015)................................................17

*Stone v. Advance Am.*,
278 F.R.D. 562 (S.D. Cal. 2011) .................................................................11

*Sweet v. United Parcel Serv., Inc.*,
No. CV 09-02653 DDP (RZx),
2010 WL 11507624 (C.D. Cal, Oct. 13, 2010)............................................22

*Thompson v. Am. Tobacco Co.*,
189 F.R.D. 544 (D. Minn. 1999) .................................................................10

*Turner v. Diversified Adjustment Serv., Inc.*,
No. 00 C 463,
2000 WL 748124 (N.D. Ill. May 31, 2000)..................................................30

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)................................................................................17, 30

*Villacres v. ABM Indus. Inc.*,
189 Cal. App. 4th 562 (2010) .....................................................................10

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).............................................................................*passim*

*Ward v. United Airlines, Inc.*,
  9 Cal. 5th 732 (2020) ...................................................................................................... 26

*Washington v. Joe's Crab Shack*,
  271 F.R.D. 629 (N.D. Cal. 2010) ........................................................................ 17, 20, 23

*Weigele v. FedEx Ground Package Sys., Inc.*,
  267 F.R.D. 614 (S.D. Cal. 2010) .................................................................................... 28

*Yastrab v. Apple*,
  173 F. Supp. 3d 972 (N.D. Cal. 2016) ............................................................................ 25

*Zayers v. Kiewit Infrastructure West Co.*,
  No. 16-CV-06405 PSG (PJW),
  2017 WL 4990460 (C.D. Cal. Oct. 26, 2017) ................................................................ 21

**Statutes, Rules, and Regulations**

49 C.F.R. § 383.51 ................................................................................................................. 8

49 C.F.R. § 391.41 ................................................................................................................. 7

49 C.F.R. § 391.43 ................................................................................................................. 7

49 C.F.R. Part 395 ................................................................................................................. 8

49 C.F.R. Part 396 ................................................................................................................. 8

49 U.S.C. § 31141 ............................................................................................................... 22

Cal. Lab. Code § 218.5 ........................................................................................................ 28

Cal. Lab. Code § 226(e) ...................................................................................................... 28

Cal. Lab. Code § 226(e)(1) .................................................................................................. 28

Cal. Lab. Code § 229 ........................................................................................................... 26

Cal. Lab. Code § 1194 ......................................................................................................... 28

Fed. R. Civ. P. 23(b)(3) ....................................................................................................... 27

Fed. R. Civ. P. 23(b)(3)(A) ................................................................................................. 27

**Other Authorities**

Cal.'s Meal & Rest Break Rules for Commercial Motor Vehicle Drivers;
   Petition for Determination of Preemption,
   83 FR 67470-01 (Dec. 28, 2018) .................................................................... 22

Plaintiffs seek certification of a putative class of thousands of drivers who have hundreds of different employers, different work schedules, different grievances, and different experiences. They claim FedEx Ground is their joint employer and thus responsible for the drivers' <u>direct employers'</u> alleged violations of benefits, wage, and meal and rest break laws. Rather than sue the Service Providers who employ them, Plaintiffs sued only FedEx Ground, seeking a statewide California class of all drivers employed by all Service Providers who contracted with FedEx Ground to deliver packages. This strategy requires Plaintiffs to prove, as a threshold matter, that FedEx Ground is also their employer. It also requires Plaintiffs to abandon claims that are important to class members so that Plaintiffs could present only claims they think are more likely to be certified. Plaintiffs' strategy reveals that this case is <u>not</u> about protecting drivers' rights, but about certifying any class to pressure FedEx Ground to settle. Class certification should be denied.

**Plaintiffs are not adequate class representatives.** In an effort to get any statewide class certified against FedEx Ground by any means necessary, Plaintiffs and their counsel chose to abandon class members' claims for unpaid wages, including overtime. But by not seeking certification of these claims, they may become time barred (or substantially time limited), barred by the doctrine of claim preclusion, or both. This strategic decision shows Plaintiffs and their counsel cannot adequately represent the proposed class.

**The joint-employment question is not common and would not "drive the resolution" of the class claims.** Whether FedEx Ground is a joint employer will not "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted). The evidence shows substantial, legally significant variation across thousands of putative class members as to their interactions with FedEx Ground, meaning that "joint employment" is an inherently individualized inquiry. Further, most wage-and-hour class actions start with a complaint against an actual employer, not against an <u>alleged</u> employer. A determination that FedEx Ground jointly employs all drivers (it does not) would drive this litigation only to the point where most wage-and-hour actions begin—the starting gate.

**Individualized issues on liability predominate.** Individual liability questions predominate here. The Court would have to decide whether each class member took breaks, administratively

exhausted their benefit claims, chose to forgo breaks to finish work early, or presents claims preempted by federal law. There are also individualized issues to establish Plaintiffs' benefits and wage statement claims. All of those questions must be decided on a driver-by-driver basis, which means Plaintiffs cannot satisfy Rule 23(b)(3) predominance.

**Individualized issues on damages predominate.** Each putative class member has individualized damages issues that cannot be reasonably or manageably determined at trial.

**Superiority and manageability are lacking.** Plaintiffs envision <u>at least</u> three separate trials and other highly unusual, staged litigation procedures. This action simply cannot be tried to verdict as one case. Drivers with valid claims should pursue individual or small group actions against individual Service Providers as the superior method of adjudication.

**Plaintiffs have not proved typicality for the Pickup and Delivery ("P&D") subclass.** Plaintiff Sterling settled claims with a Service Provider, which makes him atypical.

For all of these reasons and those stated below, the Court should deny class certification.

## STATEMENT OF FACTS

### A. FedEx Ground Contracts with Thousands of Independent Businesses to Provide Delivery Services Throughout the United States

FedEx Ground is a federally-registered motor carrier that offers package pickup, delivery, and information services throughout the United States. (Means Decl. ¶ 3, Ex. 1.) It has thousands of stations and hubs across the United States and more than 150,000 employees. (*Id.* ¶ 3.) FedEx Ground contracts with thousands of Service Providers (independently owned and operated small businesses) to provide "last mile" pickup and delivery between customers and FedEx Ground stations. Service Providers also may perform linehaul services to ferry packages between FedEx Ground hubs and stations.[1] (*Id.* ¶¶ 3, 7–8.)

FedEx Ground benefits by working with local businesses to prioritize and ensure last-mile delivery efficiency. (*Id.* ¶ 9.) Service Provider owners benefit by leveraging a national brand and

---

[1] Linehaul drivers might perform one run and return to the same station that same day, travel solely within California, or travel several days across multiple states with a co-driver. When they drive with a co-driver, they take turns driving and resting in a sleeper berth. (Means Decl. ¶ 14.)

owning a business in an industry that, with complex regulations and the scale of nationwide service, can be difficult to enter alone. (*Id.*) Drivers benefit by having a local employer they interact with directly, and the flexibility to move between businesses to negotiate pay, benefits, workload, and schedules. (Sterling Dep. 97:18–102:15, Ex. 72 (left one Service Provider to join another for better pay); Sagarino Decl. ¶ 2, Ex. 17 (driver "would basically bounce around to get the best runs and the best pay"); Gastélum Decl. ¶ 13, Ex. 20 ("I know the owners of the company . . . personally. They are very supportive of me when I need coverage or help."); K. Williams Dep. 61:4-22, Ex. 49 (leveraged competing Service Provider offers to negotiate raise from $14 to $25 per hour).)

During the proposed class period, FedEx Ground contracted with about 895 Service Providers in California, who collectively employed more than 20,000 individuals and earned hundreds of millions of dollars in annual revenue. (Means Decl. ¶¶ 7-8, Ex. 1.) Service Providers can, and sometimes do, contract with other companies, like Amazon, to provide delivery services.[2] (*Id*. ¶ 12, Ex. 1; Stricevic Decl. ¶ 8, Ex. 8.) Some Service Provider owners delegate management of their day-to-day operations to others (designating certain managers as "Business Contacts" to discuss issues with FedEx Ground), while others are "hands-on" proprietors. (Means Decl. ¶ 9, Ex. 1.) The Service Providers' "Authorized Officers" negotiate and administer the Agreements, but rarely drive. (Freeman Decl. ¶ 8, Ex. 26; Diniz Dep. 32:9–33:2, 41:9–42:3, Ex. 51.) Service Providers often employ personnel or contract with vendors to handle recruiting, human resources, and payroll. (*E.g.*, Freeman Decl. ¶¶ 9-10, 19, Ex. 26; Lopez Decl. ¶ 6, Ex. 14; Secord Decl. ¶¶ 7, 13, Ex. 76.) Many provide their drivers with benefits, and those vary by Service Provider.[3]

**B.     Service Provider Agreements Are <u>Not</u> Uniform**

Contrary to Plaintiffs' claim, the Service Provider Agreements are not "form contracts." (Pls.' Mem. 3.) There is a base Agreement that has changed over the years, but many material terms

---

[2] By contract and federal law, Service Providers cannot deliver for other companies using the FedEx Ground logo or while delivering FedEx Ground packages at the same time. (Means Decl. ¶ 12.)

[3] Gastélum Decl. ¶ 5, Ex. 20 (Service Provider offers 401(k), medical benefits); Turner Dep. 61:18–62:8, Ex. 82 (contributes to drivers' health insurance plans); Tenter Decl. ¶ 10 & Ex. B, Ex. 12 (offers 401(k) plan with matching contributions, group health benefits, dental insurance, paid time off, paid vacation, and sick pay); Stricevic Decl. ¶¶ 19, 27 & Exs. A & B, Ex. 8 (offers 401(k) plan, medical, dental, life insurance, paid vacation, paid time off, paid sick leave).

are negotiated and set out in addenda, riders, and schedules. (Means Decl. ¶ 15, Ex. 1; Verduzco Decl. ¶¶ 3-4, Ex. 73.) For example, FedEx Ground and Service Providers negotiate the amount FedEx Ground pays, the daily service threshold, and the Agreement's duration. (Means Decl. ¶ 15, Ex. 1; Freeman Decl. ¶ 3, Ex. 26; Verduzco Decl. ¶¶ 3-4, Ex. 73.)

Service Providers also negotiate whether to participate in the brand promotion program, in which Service Providers are paid if their employees display FedEx Ground logos on their vehicles or clothing; and if so, how much. (Means Decl. ¶ 16, Ex. 1.) Service Providers can participate in only the clothing promotion or for only some of their trucks, or choose not to participate at all. (*Id.*; Means Dep. 144:22–145:10, Ex. 65; Stricevic Decl. ¶ 9, Ex. 8 (no uniforms because drivers also deliver for Amazon).) Some Service Providers make FedEx Ground uniforms available, but do not require their drivers to wear them. (Prasad Decl. ¶ 24, Ex. 7.)

## C.    Service Providers Decide How to Operate Their Businesses

Under their Agreements, FedEx Ground pays Service Providers for results, but does not dictate how they achieve those results. The Agreements state the Service Provider "has the sole right and obligation to supervise, manage, direct, procure, perform or cause to be performed, all services to be provided by [it] under this Agreement." (Means Decl. ¶ 18, Ex. 1; *id.* ¶ 13; ISPA § 1.2, ECF No. 293-1; TSPA § 1.2, ECF No. 293-2.) The Agreements prohibit FedEx Ground from managing Service Providers' employees: "No officer, agent, or employee of FXG has authority to direct" the Service Provider's personnel "as to the methods, manner or means employed" in providing services.[4] (Means Decl. ¶¶ 18-19 & Ex. B, Ex. 1; ISPA § 1.2, ECF No. 293-1; TSPA § 1.2, ECF No. 293-2.) Service Providers have "sole and complete discretion in the staffing, selection, hiring, training, supervision, assignment, hours and days worked, discipline, termination, compensation, benefits, and all other terms and conditions of employment." (Means Decl. ¶ 18, Ex.

---

[4] As one owner explained, "We are the owners of a legitimate small business that we have invested our time, money, and hearts into. To suggest that Clere Solutions is nothing more than a sham 'direction taker' from FedEx Ground is extremely insulting." (Clere Decl. ¶ 17, Ex. 11.) Another found Plaintiffs' "suggestion that Armada was basically just a mouthpiece for FedEx Ground that did nothing other than execute FedEx Ground instructions could not be farther from the truth and it's frankly insulting." (Stricevic Decl. ¶ 24, Ex. 8; *see also id.* ¶¶ 1-3 (this same Service Provider uses drivers from a third-party staffing company that its Authorized Officer owns)).

1; ISPA § 6.4, ECF No. 293-1; TSPA § 6.4, ECF No. 293-2.)  As one owner stated: "My management team and I instructed him, designed his routes, determined what vehicles he would be driving and when, and many other things.  He dealt with us, not FedEx."  (Clere Decl. ¶ 16, Ex. 11.)

Service Providers agree to "bear all expenses associated with" employing their drivers, including paying "wages [and] salaries," and to "assume sole responsibility for . . . maintenance of payroll and employment records, and for compliance with all applicable federal, state, and local laws, including without limitation, wage payment, . . . overtime, and rest and meal periods."  (Means Decl. ¶ 26, Ex. 1; ISPA § 6.2(B)-(C), ECF No. 293-1; TSPA § 6.2(B)-(C), ECF No. 293-2.)

FedEx Ground trains its employees on the Agreements, making sure they understand they have no authority to manage, supervise, or discipline drivers or dictate how they do their work.[5] (Means Decl. ¶ 21 & Ex. B (Policy-007), Ex. 1; Means Dep. 200:17–201:21, Ex. 65.)  If a FedEx Ground employee disregards this, they breach the Agreement and can be disciplined, up to being fired.  (Means Decl. ¶ 20, Ex. 1; Means Dep. 201:7-9, Ex. 65; Freeman Decl. ¶ 32, Ex. 26; Diniz Dep. 114:22–115:6, Ex. 51.)

In short, Service Providers make all decisions regarding their businesses, including who and how many persons to employ; how many and which types and sizes of trucks to operate; who will drive which trucks; how to train and assign each employee; how to design delivery routes; who drives which routes, and when; how to assign packages to drivers; drivers' hours and schedules; how to pay drivers; and whether to provide benefits.[6]  Service Providers decide whether and how to recruit, hire, discipline, and terminate their employees.[7]  Drivers raise employment issues with their

---

[5] Some drivers testified that some FedEx Ground employees interacted directly with drivers. But, as one driver explained, that "[d]epend[s] on the manager or the person working in the office," further underscoring the variability among putative class members.  (Villanueva Dep. 36:16–37:5, Ex. 58.)

[6] Means Decl. ¶ 22, Ex. 1; Means Dep. 144:22–145:10, 150:18-19, 185:1-22, Ex. 65; Sagarino Decl. ¶ 7, Ex. 17 ("I do not permit FedEx Ground to get involved in the management of Bubba Sag's employees."); *see also* Apps. A, C, D.

[7] *See* Apps. A, C, D; Diniz Dep. 47:25–48:4, 55:12–56:11, 57:1-6, 58:15–59:20, 62:23–64:5, 141:25–142:20, Ex. 51; Ataie Decl. ¶¶ 11-13, 23, Ex. 16 ("Wahoo always handled its own recruitment and hiring of drivers.  Wahoo made its own decisions regarding driving hiring and retention, based on its own standards and preferences regarding what type of drivers we liked to work with (hard-working, willing to learn, independent, team players).").

Service Provider, not FedEx Ground.[8]

**D.  Service Providers Are Responsible for Complying with Labor Laws**

Service Providers are responsible for complying with state and federal labor laws for their employees.  (Means Dec. ¶ 26, Ex, 1; ISPA § 6.2, ECF No. 293-1; TSPA § 6.2, ECF No. 293-2.)  They develop their own methods for complying with the Labor Code, including their own timekeeping and payroll systems, policies, training, and oversight.[9]  They differ in whether and how their employees track hours worked and breaks.  (*See* Apps. A, C, D.)  Drivers might record their working time using a time-keeping app on their phones or handwritten time sheets.[10]

Service Providers also differ in whether, and how, they communicate regarding drivers' breaks and break policies.  (*Id*.)  Some did not provide written break procedures, but claim to have orally informed their drivers.[11]  Others instruct their employees both orally and in writing.[12]  Some regularly monitor time records to ensure drivers are taking breaks.[13]  Some pay meal and rest break premiums when they learn their drivers were unable to take breaks.  (*E.g.*, Lopez Decl. ¶ 16, Ex. 14.)

Appendix A highlights differences among the Service Providers' practices and Appendices C and D highlight differences among P&D and Linehaul drivers, respectively.  Plaintiffs cite to driver declarations as "evidence" of commonality (Pls.' Mem. iii, 11, 14, 23), but those declarations are mostly attorney-drafted boilerplate and, as shown in Appendix E, are contradicted by the declarants'

---

[8] *E.g*., Alvarado Dep. 49:18–51:3, Ex. 59 (Service Provider allowed him to reduce working days from five to three or four per week to help him care for his children).

[9] *E.g*., Freeman Decl. ¶¶ 9-11, Ex. 26; Diniz Dep. 77:7-25, 87:9–89:1 & Dep. Ex. 13, Ex. 51; Sosa Dep. 39:12–41:4, Ex. 33; Secord Decl. ¶¶ 11, 13, Ex. 76.

[10] Kim Decl. ¶¶ 13-14 & Ex. B, Ex. 5 (employees verified breaks on handwritten time cards).

[11] *E.g*., Parikh Dep. 66:18-22, Ex. 63 (Bay Rim had no written policy, but orally explained it). *But see* Hinds Dep. 46:6-12, Ex. 55 (claiming no one at Bay Rim explained to her a break policy).

[12] *E.g*., Freeman Decl. ¶¶ 14-15, Ex. 26; Diniz Dep. 84:7-19, 99:3-20, 116:20–117:14 & Exs. 15, 18, Ex. 51; Ataie Decl. ¶¶ 27–28, Ex. 16; Sosa Dep. 55:4-22, Ex. 33; Lopez Decl. ¶¶ 15–16, Ex. 14.

[13] *E.g*., Sosa Dep. 55:1-11, Ex. 33 (A.D. Sosa drivers signed break policy); Clere Decl. ¶ 7, Ex. 11 (drivers were required to track time, including lunch breaks, on handwritten time cards); Dane Dep. 24:20–26:14, Ex. 87 (managers review drivers' timecards weekly to ensure breaks are recorded); Diniz Dep. 74:6-17, 75:24–76:15, 77:7-14, Ex. 51 (drivers handwrite time cards, which MRD Transport then manually enters into electronic spreadsheets).

later testimony or the testimony or evidence of their Service Provider.[14] (*E.g.*, Arballo Dep. 95:21–96:2, Ex. 44 (declaration says no realistic opportunities for lunch breaks, but he admitted he actually stopped for lunch many times).) In fact, one driver testified that nearly everything Plaintiffs' lawyers wrote in his declaration is false. (Gallegos Decl. ¶¶ 5-6, 9–14, Ex. 27.)

### E.    FedEx Ground Does Not Exercise Control Over Drivers

As shown in Appendix B, Plaintiffs misstate contract terms to allege FedEx Ground exercises "significant control" over drivers. (Pls.' Mem. 4–17.) Plaintiffs conflate services the <u>Service Providers</u> agreed to provide with <u>drivers</u>' duties as Service Provider employees. For example, Service Providers agree to operate seven days a week, but the Agreements do <u>not</u> say anything about drivers' work schedules, much less require drivers to work every day.[15] (ISPA, ECF No. 293-1; TSPA, ECF No. 293-2; Freeman Decl. ¶ 18, Ex. 26; Diniz Dep. 117:21–118:5, Ex. 51.) Service Providers alone dictate their drivers' work schedules.

Many contract terms relate to Service Providers' compliance with federal regulations. (*See* Pls.' Mem. 4–7, 9–12.) FedEx Ground is subject to the U.S. Department of Transportation's (DOT) regulatory authority and the Federal Motor Carrier Safety Administration (FMCSA). (Means Decl. ¶ 30, Ex. 1.) DOT regulations impose obligations on FedEx Ground and, in turn, Service Providers operating under FedEx Ground's DOT authority. (*Id.*; Means Dep. 82:21–83:23, Ex. 65.)

DOT regulations require drivers to pass a background check, medical examination, initial drug screening, and periodic drug tests and also to have a set amount of driving experience or training to drive certain commercial vehicles. 49 C.F.R. §§ 391.41, 391.43. If the minimum qualifications are met, Service Providers are free to hire anyone using their employment criteria.

---

[14] *E.g.*, Clere Decl. ¶ 2, Ex. 11 (declarant Grigoryan's "statements are false with respect to his time with Clere Solutions"); Sheban Decl. ¶ 8 & Ex. B, Ex. 6 ("The timesheet shows that Mr. Ramirez clocked-out for a thirty minute lunch break each day."); Staples Decl. ¶ 6, Ex. 25 ("Mr. Arballo . . . falsely states that he worked as a 'pick-up and delivery' driver when in fact he actually worked as a linehaul driver."); Khalik Decl. ¶ 6, Ex. 19 ("his statements about working 6 days a week, 72-84 hours a week, could not be further from the truth. He was basically a part-time driver!"); Kwan Decl. ¶ 4, Ex. 22 ("Declaration of Juan Manuel Ivan Perez filed in this case, [] is rife with inaccurate statements and blatant falsehoods."); *see also* App. F).

[15] Means Decl. ¶ 22, Ex. 1; Means Dep. 54:1-7, Ex. 65; Freeman Decl. ¶¶ 21, 28-29, Ex. 26; Diniz Dep. 48:17–49:6, 50:16-23, 52:21-24, 118:15-20, Ex. 51; Lopez Decl. ¶¶ 25-26, Ex. 14.

(Freeman Decl. ¶¶ 26-27, Ex. 26.)  Similarly, DOT regulations require that commercial delivery vehicles display certain information and be regularly maintained and inspected.  49 C.F.R. Part 396. They require drivers to record "on duty" and "off duty" time and not drive more than 14 hours after coming "on duty" or more than 70 "on duty" hours per week.  49 C.F.R. Part 395.  DOT regulations also list circumstances in which a driver <u>must</u> be disqualified from driving (e.g., drunk driving, preventable accidents, violations of Hours of Service rules), and for how long.  49 C.F.R. § 383.51. If a driver is disqualified under DOT regulations, however, that does <u>not</u> mean the Service Provider must terminate their employment.  (*E.g.*, Freeman Decl. ¶ 24, Ex. 26; Diniz Dep. 63:22–64:5, Ex. 51.)  FedEx Ground has no right to terminate any driver's employment.  (Means Decl. ¶¶ 18, 25, 31, Ex. 1.)  Service Providers can choose to employ the driver in a non-driving role while the employee remains disqualified, and disqualified drivers can, and do, perform non-driving work for Service Providers as mechanics, managers, or delivery helpers.  (*E.g.*, Diniz Dep. 63:10–64:12, Ex. 51.)

### F.  Scanner Data Does Not Measure Compensable Time or Breaks

Plaintiffs claim they can use scanner data to determine damages for untaken or interrupted meal-and-rest periods.  (Pls.' Mem. 11–12, 23.)  But scanner data does <u>not</u> measure compensable time; they measure only DOT "hours of service."  (Means Dep. 80:17–82:3, Ex. 65; Means Decl. ¶ 32, Ex. 1.)  Breaks during the workday do not stop DOT's 14-hour allowable "on duty" window, so drivers do <u>not</u> and <u>cannot</u> record their breaks, lunches, or personal errands.  (Freeman Decl. ¶ 12, Ex. 26; Sosa Dep. 113:9-20, Ex. 33; Secord Decl. ¶ 12, Ex. 76.)  Scanner data thus is over-inclusive of compensable time.  (Means Decl. ¶ 34, Ex. 1.)

### <u>ARGUMENT</u>

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  Rather, Plaintiffs "must affirmatively demonstrate [their] compliance with the Rule—that is, [they] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id*.  Plaintiffs also must meet Rule 23(b)(3)'s heightened burden of showing that common questions predominate over individual ones, and that a class action is the superior method of adjudication. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).  The Court must undertake a "rigorous analysis" to make sure Plaintiffs have done so. *Id*.

# I. PLAINTIFFS AND CLASS COUNSEL ARE INADEQUATE REPRESENTATIVES

This is the unusual case where Plaintiffs and their counsel have proven they are inadequate class representatives. They did so by abandoning class members' overtime and unpaid wage claims.

Plaintiffs' Complaint is filled with allegations that their Service Providers did not pay them for all hours worked, including overtime wages and for nonproductive time, and they plead waiting time penalties. (Compl. ¶¶ 5, 12-16, 55-56, 73-77, 116-27, 146-56, 157-64, 165-68, 180-84, ECF No. 119.) In their depositions, Plaintiffs and driver declarants testified they think they are entitled to such unpaid wages and penalties. (*E.g.*, Bell Dep. 30:15-20, Ex. 31; Kennedy Dep. 109:18-22, Ex. 52; Seuth Dep. 21:10-23, Ex. 45; Smock Dep. 53:10-11, Ex. 50; K. Williams Dep. 50:13-17, Ex. 49.) Indeed, Plaintiff Sterling claims he was not paid for time loading and unloading his truck (Sterling Dep. 103:10-18, 154:11-12, Ex. 72), while Plaintiff Sobaszkiewicz claims she was not paid for pre-trip time at the station (Sobaszkiewicz Dep. 62:3-12, 77:1-7, 158:6-9, Ex. 71). Further, nearly all of Plaintiffs' 64 drivers-declarants complain they were not paid for all hours worked, including overtime. (*See generally* Compendium of Class Member Declarations, ECF No. 287-2.)

Despite Plaintiffs' and declarants' stated desire to pursue claims for hours worked, minimum wages, and overtime, Plaintiffs do not seek to certify <u>any</u> of those claims. (Pls.' Notice of Mot. iii.) The reason is obvious: evidence to prove these wage violations is indisputably individualized. By abandoning these claims, however, Plaintiffs and their counsel revealed they are not adequate class representatives and class counsel, respectively.

Rule 23(a)(4) is satisfied only where class representatives have common, not antagonistic, interests with unnamed class members and will vigorously prosecute the class members' claims through qualified counsel. *See Pierce v. Cty. of Orange*, 526 F.3d 1190, 1202 (9th Cir. 2008). Plaintiffs' strategic choice to abandon claims proves they fail to meet either prong of this test.

First, because Plaintiffs do not seek class treatment of the unpaid wage and overtime claims, the statutes of limitations for class members' claims already have begun to expire, and will continue to expire, because the limitations periods are no longer tolled. *See Glidden v. Chromalloy Am. Corp.*, 808 F.2d 621, 627 (7th Cir. 1986) ("The voluntary dismissal of the class component of a suit also must restart the time. . . . This is a risk whenever and however the plaintiff deletes a class

allegation."); *Currithers v. FedEx Ground Package Sys., Inc.*, No. 04-10055, 2012 WL 458466, at *8 (E.D. Mich. Feb. 13, 2012) ("Tolling on Plaintiffs' fraud claim ended when it was excluded from Plaintiffs' motion for class certification on April 2, 2007."). Putative class members, including the declarants, believe their rights are being protected when, in fact, they are not. (*E.g.*, Kennedy Dep. 105:6-108:19, Ex. 52 (unaware minimum wage claim was not being pursued).)

Second, Plaintiffs' strategic choice may foreclose future wage claims for putative class members. Claim preclusion would bar the class from separately seeking recovery of unpaid wages from FedEx Ground or their Service Providers. *Krueger v. Wyeth, Inc.*, No. 03CV2496 JLS (AJB), 2008 WL 481956, at *3 (S.D. Cal. Feb. 19, 2008) ("[R]es judicata . . . bars parties to a prior action[,] or those in privity with them[,] from raising in a subsequent proceeding any claim they could have raised in the prior action where all of the claims arise from the same set of operative facts."). As a result, "a serious question of adequacy of representation arises when the class representatives profess themselves willing, as they do here, to assert on behalf of the class only [certain] claims." *Id.*

For this reason, courts deny certification where the class plaintiffs seek to certify only some of the available class claims. *See, e.g.*, *id.*; *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 550–51 (D. Minn. 1999); *Pearl v. Allied Corp.*, 102 F.R.D. 921, 922–23 (E.D. Pa. 1984). In denying certification, the *Kreuger* court explained that the plaintiff's "effort to improve the possibility of demonstrating commonality" by narrowing the class claims "was purchased at the price of presenting putative class members with significant risks of being told later that they had impermissibly split a single cause of action."[16] 2008 WL 481956, at *3. Adequacy was not satisfied there because the "plaintiffs would effectually be waiving, on behalf of the hundreds of class members, any possible recovery of potentially substantial damages—present or future." *Id.*

The false statements Plaintiffs' counsel included in the drivers' declarations also shows the

---

[16] Claim splitting may be permissible only if "the risk of preclusion is low" or the waived claims have little to no value. *Andren v. Alere, Inc.*, No. 16CV1255-GPC (AGS), 2017 WL 6509550, at *12 (S.D. Cal. Dec. 20, 2017). Neither applies here. First, the risk of preclusion is high. *E.g.*, *Villacres v. ABM Indus. Inc.*, 189 Cal. App. 4th 562, 569 (2010) (Labor Code claims barred by claim preclusion because class "could have sought to expand the scope of the prior action to include his additional penalty claims."). Second, if Plaintiffs' allegations are true, the class members' overtime and other wage claims have substantial value to drivers.

inadequacy of Plaintiffs' counsel. *See* App. E. Clear evidence shows counsel put undue pressure on declarants to say what the lawyers wanted them to say.[17] One court found counsel inadequate when they "'copied and pasted' numerous paragraphs into the various declarations in an apparent attempt to establish" class certification, but "failed to . . . insure [sic] the accuracy of the statements," and failed to "impress upon Plaintiffs the importance of making only truthful statements." *Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568, 578–79 (C.D. Cal. 2007).[18]

Ultimately, Plaintiffs' choice to forgo significant claims creates an intractable conflict between Plaintiffs and the putative class and proves Plaintiffs will not vigorously prosecute drivers' interests. This inadequacy is further confirmed by Plaintiffs' reliance on flawed declarations.

## II. PLAINTIFFS CANNOT SATISFY RULE 23(a)(2) COMMONALITY

Rule 23(a)(2) requires Plaintiffs to identify a common question that is "capable of classwide resolution," meaning "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Plaintiffs must show "the class members have suffered the same injury," and the class action is capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." *Id.* There is no commonality if "the resolution of 'common issues' depends on factual determinations that will be different for each class plaintiff." *Stone v. Advance Am.*, 278 F.R.D. 562, 569 (S.D. Cal. 2011).

To try to show commonality, Plaintiffs focus on the question of whether FedEx Ground is a joint employer. (Pls.' Mem. 17–19.) This "question," however, raises many other questions bearing

---

[17] As one declarant recanted, he "d[id]n't miss meal and rest breaks" and "do[es]n't consider FedEx Ground to be my employer." (Gallegos Decl. ¶ 6, Ex. 27.) Rather, he "was approached and pressured multiple times by people claiming they were representing drivers in a lawsuit against FedEx Ground, asking me to sign a statement. . . . Finally, agreed to sign so that they would leave me alone . . . . They did not tell me to review it, they just told me to sign it. . . . They never provided me a full copy. I assumed the statement had in it what I told them, . . . [b]ut it did not. I did not give those people permission to use that statement" [for their case.]. . . ." (*Id.* ¶¶ 3–6.)

[18] Plaintiffs' counsel employed this same strategy. For example, <u>nine</u> different declarants included the distinctive claim that "[t]he work is fast paced and busy, with little time for rest." (Evangelisti Decl. ¶ 6; Girgoryan Decl. ¶ 6, Kelvie Decl. ¶ 7, Lopez-Diaz Decl. ¶ 7, Martinez Decl. ¶ 7, Quan Decl. ¶ 5, Smith Decl. ¶ 8, Villanueva Decl. ¶ 6, Williams Decl. ¶ 7, ECF No. 287-2.) But this lawyer-generated rhetoric does not reflect any real, common experience of being "too busy" for breaks. (*See, e.g.*, Crandall Decl. ¶¶ 87-88, Ex. 3 (finding that, on average, 46.9% of drivers completed their last stop before 4:30 pm, and 54.8% logged off-duty before 5:30 p.m.).)

---

on discrete aspects of joint employment and each specific claim they seek to certify.  (*Id.* at 19–25.)
This scattershot approach fails to meet their burden. Plaintiffs cannot prove joint employment
through common evidence.  Even if they could, that one supposedly common question is only a
threshold issue.  It says nothing about FedEx Ground's liability for each claim. Liability remains
hopelessly individualized, defeating commonality.  *See Dukes*, 564 U.S. at 350.

### A.    Plaintiffs Cannot Prove Joint Employment With Common Evidence

Plaintiffs have not presented any evidence that arguably could prove joint employment for all
drivers under any of the tests set out in *Martinez v. Combs*, 49 Cal. 4th 35 (2010).  In fact, some
drivers admitted FedEx Ground is not their employer.  (Rasmussen Decl. ¶ 3, Ex. 18 ("It's pretty
clear to me that FedEx Ground is not my employer."); Gallegos Decl. ¶ 6, Ex. 27 ("I don't consider
FedEx Ground to be my employer.").)  Plaintiffs fail to prove commonality.  *See Heredia v. Eddie
Bauer LLC*, No. 16-cv-06236, 2020 WL 127489, at *5 (N.D. Cal. Jan. 10, 2020) (no commonality
where "employees' experience . . . varied significantly," even though written policy was at issue).

### 1.    *Plaintiffs Lack Common Evidence to Satisfy the "Control" Test*

Under the "control" test, Plaintiffs must prove FedEx Ground had "control over [their]
wages, hours, or working conditions."  *Salazar v. McDonald's Corp.*, 944 F.3d 1024, 1029 (9th Cir.
2019).  Plaintiffs proffer no common evidence showing such control.  In fact, Plaintiffs claim that
FedEx Ground "passes off responsibility" to Service Providers regarding major employment
decisions, including payroll.  (Pls.' Mem. 18.)  But that is the opposite of control. *See Curry v.
Equilon Enters., LLC*, 23 Cal. App. 5th 289, 303 (2018) (when Shell merely "required particular
tasks be performed by [the station], but did not mandate who or how many employees execute the
tasks," no evidence of control); *cf. Dukes*, 564 U.S. at 355 ("[A]llowing discretion by local
supervisors . . . is just the opposite of a uniform employment practice that would provide []
commonality.").  The evidence shows Service Providers decide wages, hours, and other employment
conditions.[19]  Commonality does not exist if the alleged practice is "a product of the vagaries of the

---

[19] Plaintiffs argue that the Agreements are uniform and, thus, common evidence of joint
employment. (Pls.' Mem 20.)  In support, they rely on *Seene v. Kansas City Royals Baseball Corp.*,
but that decision denied certification and is not analogous.  No. 14-CV-00608-JCS, 2015 WL
6152476, at *2 (N.D. Cal. Oct. 20, 2015).  The *Seene* class members signed contracts with a uniform

[place] an employee worked in, the time of year, or the manager who was in charge." *Ordonez v. Radio Shack, Inc.*, No. CV 10-7060-CAS JCGX, 2013 WL 210223, at \*8 (C.D. Cal. Jan. 17, 2013).

Plaintiffs rely on the fact that drivers deliver FedEx Ground packages, work out of FedEx Ground facilities, and <u>some</u> wear branded uniforms or drive branded trucks. (Pls.' Mem. 1, 5, 20.) None of these facts show FedEx Ground's "control over wages, hours, or working conditions." *Salazar*, 944 F.3d at 1029; *Curry*, 23 Cal. App. 5th at 303. Just as McDonald's does not "control" or employ a McDonald's franchisee's employee—even though that person wears a McDonald's uniform and serves McDonald's food—FedEx Ground does not "control" a Service Provider's employees. Like McDonald's in *Salazar*, FedEx Ground "need[s] the freedom to 'impose[] comprehensive and meticulous standards for marketing [their] trademarked brand and operating [their][businesses] in a uniform way." 944 F.3d at 1030; *see also Martinez*, 49 Cal. 4th at 76–77 (brokers did not "control" farmer's workers despite "instructing workers on how best to pack the strawberries" for "quality control purposes"). Here, FedEx Ground does not even mandate uniforms or logos—the individual Service Providers make that decision.

Plaintiffs argue the drivers' use of scanners is evidence of FedEx Ground's control, alleging FedEx Ground could implement "mechanisms for providing the opportunity to take meal and rest breaks." (Pls.' Mem. 23.) But FedEx Ground's unrefuted evidence shows the scanners are used to provide customers with updates on their packages and to comply with DOT regulations. (Means Decl. ¶ 32, Ex. 1.) Service Providers' agreement to have their drivers perform certain tasks "on a daily basis" for regulatory and quality-of-service purposes does not give FedEx control over the Service Providers' employees.[20] *Curry*, 23 Cal. App. 5th at 303.

Moreover, analysis of available scanner data actually suggests the absence of FedEx Ground's control. Plaintiff's expert, Dr. Drogin, unsurprisingly is silent on this point, but FedEx Ground's expert opines "there is no analytical support for the proposition that FedEx somehow

---

compensation policy. Here, the drivers did <u>not</u> sign the Agreements, which are not identical.

[20] Drivers' reports of "control" differ. *Compare* Barsz Dep. 50:18-22, Ex. 61 (daily contact with FedEx Ground employees), *with* Ginn Dep. 40:4–41:4, Ex. 35 (only FedEx Ground communication was accepting the route or en route communication when route changes).

exerts control that results in standardized experiences across drivers, regardless of which CSP employs them." (Crandall Decl. ¶ 76, Ex. 3.) On the contrary, analysis of "every dimension that can be measured by the data," including for example shift length, start and end time, average trip time, average miles driven, and others, reveals wide variation consistent with Service Provider and driver control over operations, not common control by FedEx Ground. (*Id.* ¶¶ 76-82.)

### 2. Plaintiffs Lack Common Evidence for the "Suffer or Permit to Work" Test

The "suffer or permit" test assesses if the alleged employer controls hiring, firing, wages, and hours, *Martinez*, 49 Cal. 4th at 70, which Plaintiffs lack evidence about. Like the brokers in *Martinez* and Shell in *Curry*, FedEx Ground has no authority regarding hiring, firing, wages, or assigning work. (Facts §§ C, E, *supra*.) Plaintiffs note that drivers perform some work in FedEx Ground facilities and drive vehicles operated under FedEx Ground's DOT authority (Pls.' Mem. 5), but neither relates to hiring, firing, paying, assigning work, or anything relevant to "suffer or permit." *See Curry*, 23 Cal. App. 5th at 308 (Shell is not a joint employer even though it provided plaintiff "a place to work and the equipment with which she performed her job").

Moreover, the fact that Service Providers agree to ensure DOT compliance does not create an employment relationship between the drivers and FedEx Ground. *See Johnson v. Serenity Transp., Inc.*, No. 15-cv-02004-JSC, 2017 WL 1365112, at *8 (N.D. Cal. Apr. 14, 2017) ("[C]ompliance with legal requirements is not indicative of control for purposes of establishing [joint employment]."). That is because monitoring for regulatory compliance is "qualitatively different" than control for employment. *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004).

### 3. Plaintiffs Lack Common Evidence to Satisfy the "Engage to Work" Test

The third *Martinez* test asks whether an alleged employer "engage[s]" employees to work, "thereby creating a common law employment relationship." *Martinez*, 49 Cal. 4th at 65. Plaintiffs cannot prove the "engage to work" test with common evidence.

Plaintiffs improperly rely on *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522 (2014), an independent-contractor misclassification case, to claim Plaintiffs are employees of FedEx Ground under the "engage to work" test. (Pls.' Mem. 19–20.) *Ayala* held that a common law employment relationship is suggested if a "hirer" "retains . . . the right to control" by being able to

"discharge the worker without cause." *Ayala*, 59 Cal. 4th at 531. This analysis applies only to allegedly misclassified independent contractors, not to joint employment claims.

Further, FedEx Ground does not hire or fire Service Providers' employees. (Facts § E, *supra*.) The fact that FedEx Ground can disqualify drivers <u>from driving</u> under DOT regulations does not show control over termination. *See Henderson v. Equilon Enters., LLC*, 40 Cal. App. 5th 1111, 1121–22 (2019) (the right to ask station operator to "remove" an employee was not "synonymous with discharge" when the agreement provided that Shell "shall not select, hire, discharge, supervise, or instruct" the operator's employees). Service Providers may, and do, employ disqualified drivers in non-driving roles. (*E.g.*, Diniz Dep. 63:10–64:12, Ex. 51 (kept one disqualified driver as a mechanic and another in an office role).) And the Agreements state FedEx Ground has <u>no</u> right to terminate Service Providers' employees (ISPA § 1.2, ECF No. 293-1; TSPA § 1.2, ECF No. 293-2), so Plaintiffs are falsely equating termination with mandatory disqualification from driving.

Plaintiffs also rely on years-old cases that had nothing to do with joint employment, but considered whether FedEx Ground misclassified full-time drivers as independent contractors. (*See* Pls.' Mem. 1–2, 20.) Plaintiffs' cited cases actually highlight why there is no common question.

First, the misclassification decisions involved a long-extinct business model in which FedEx Ground contracted directly with individual full-time drivers. *See, e.g.*, *Alexander v. FedEx Ground Package Sys.*, 765 F.3d 981, 984 (9th Cir. 2014); *In re FedEx Ground Package Sys., Inc. Emp't Practices Litig.*, 273 F.R.D. 424, 457 (N.D. Ind. 2008); *Craig v. FedEx Ground Package Sys., Inc.*, 335 P.3d 66, 72 (Kan. 2014). Unlike Plaintiffs, those contractor-drivers had no employer unless they proved they were misclassified by FedEx Ground, and those drivers actually signed the challenged contracts. Here, Plaintiffs indisputably were classified as Service Provider employees (regardless of whether FedEx Ground is claimed to be their <u>additional</u> employer), and were not bound by any contract with FedEx Ground. *See In re Wawa, Inc. Data Sec. Litig.*, No. CV 19-6019, 2021 WL 2073758, at *5 (E.D. Pa. May 24, 2021) (denying conditional certification because the plaintiff "is essentially relying . . . on evidence used in a misclassification case that was based on pre-[class period] conduct as support for his quite different claim"); *cf. Curry*, 23 Cal. App. 5th at 314 (refusing to apply independent contractor test because it does not apply to joint employment).

Second, in *Alexander* and other cases, the misclassification issue was resolved on the basis of an allegedly <u>uniform</u> "right to control" through contract. *See FedEx Ground*, 273 F.R.D. at 493–94. The MDL court denied certification for every state where the misclassification decision required examination of FedEx Ground's <u>actual</u> control over the driver-contractors and other individualized questions. *Id.* at 440–42, 456–57, 466, 475, 477–78, 482, 487, 489–90. Here, the legal tests for joint employment are similar to the actual control tests that caused the MDL court to <u>deny</u> certification of multiple classes. (*See* Argument § II.A, *supra*.)

<u>Third</u>, unlike the earlier misclassification cases, the answer to the joint employment question here does <u>not</u> prove any Labor Code violation by either the Service Provider or FedEx Ground. At most, an affirmative answer on joint employment drives the litigation to the place where almost every wage-and-hour class action begins—i.e., identifying a common employer. This situation contrasts starkly with misclassification cases, where a uniform contract with the plaintiff-contractors allegedly created an employment relationship <u>and</u> set forth the structure under which FedEx Ground paid them. Proof of misclassification, therefore, would have established <u>both</u> FedEx Ground's status as an employer and the plaintiffs' alleged wage-and-hour violations. That does not apply here.

## B. Joint Employment Would Not Drive Resolution of Plaintiffs' Claims

Plaintiffs say they satisfy commonality via the "common question of whether FedEx has legal responsibilities" as an employer. (Pls.' Mem. 1.) Whether FedEx Ground is a joint employer, however, will not "drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. "Quite obviously, the mere claim by employees of the same company that they have suffered [the same] injury . . . gives no cause to believe that all their claims can productively be litigated at once." *Id.*

Joint employment itself does not violate any law, so proving joint employment would not prove the putative class suffered any injury, let alone the same injury. In *Dukes* and *Ellis v. Costco*, the courts both held that a putative class of persons <u>indisputably employed by the same company</u> did not satisfy the commonality requirement. In *Dukes*, even though Wal-Mart was a common employer, the putative class was "[w]ithout some glue holding" their claims together; they "wish[ed] to sue about literally millions of employment decisions at once." *Dukes*, 564 U.S. at 352; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) ("If there is no evidence that the entire

class was subject to the same allegedly [illegal] practice, there is no question common to the class."). This Court, too, has found individualized issues defeat certification even when there was a common employer. *See, e.g.*, *Stockwell v. City & Cty. of S.F.*, No. C 08-5180 PJH, 2015 WL 2173852, at \*1 (N.D. Cal. May 8, 2015); *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 632 (N.D. Cal. 2010); *Perry v. U.S. Bank*, No. C-00-1799-PJH, 2001 WL 34920473, at \*1 (N.D. Cal. Oct. 16, 2001).

Plaintiffs "must present substantial evidence that proving *both* the existence of the employer's uniform policies and practices *and* the alleged illegal effects of the employer's conduct could be accomplished efficiently and manageably within a class setting." *Cruz v. Sun World Int'l, LLC*, 243 Cal. App. 4th 367, 384 (2015), *disapproved on other grounds by Noel v. Thrifty Payless, Inc.*, 7 Cal. 5th 955 (2019). They have come nowhere close to that.

### C. Plaintiffs' Other "Common" Questions Would Not Drive Resolution of Claims

None of Plaintiffs' other purportedly common questions (Pls.' Mem. 20–25) can be answered with classwide evidence either. (Argument § II, *supra* & § III, *infra*.) Even if one (or a few) could be answered with common evidence, this remains insufficient to drive resolution of the class claims.

## III. INDIVIDUAL LIABILITY AND DAMAGES ISSUES PREDOMINATE

Rule 23(b)(3)'s even "more demanding" predominance test, *Comcast*, 569 U.S. at 34, asks whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). It "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* Here, each proposed class claim requires individualized proof for both liability and damages, defeating predominance.

### A. Individual Issues Dominate Plaintiffs' Meal and Rest Break Claims

Plaintiffs claim that FedEx Ground uniformly denied them their lawful meal and rest break periods and that common questions predominate for both liability and damages. But whether each class member is entitled to meal and rest periods, whether such periods were offered, whether class members took breaks or voluntarily chose not to, and whether class members were paid meal and rest break premiums are inherently individualized inquiries. And even if Plaintiffs could prove liability against one or more Service Providers, that would not impute liability to FedEx Ground.

Moreover, damages would still have to be determined on a class member-by-class member basis.

### 1. *Evidence shows that break policies varied by Service Provider*

Plaintiffs cannot prove their break claims with classwide evidence.  They failed to offer <u>any</u> FedEx Ground policy that prevented drivers from taking breaks, because there is none.  To the contrary, Service Providers are contractually and legally required to follow wage and hour laws, which require them to make breaks available (when not preempted by federal law).  (ISPA § 6.2(c), ECF No. 293-1, TSPA § 6.2(c), ECF No. 293-2.)  Evidence shows many Service Providers made drivers aware of their rights and took steps to ensure they took breaks.  (*See* Apps. A, C, D.)  For instance, Tenter Enterprises' owner "personally emphasize[s] the importance of taking rest and meal breaks," had a break policy in the employee handbook, and tells employees to "notify me of any involuntarily missed meal or break periods."  (Tenter Decl. ¶ 8 & Ex. B at 6-7, Ex. 12.)  Clere Solutions required employees to "keep track of [their] time, including lunch breaks, on handwritten cards."  (Clere Decl. ¶ 7 & Ex. B, Ex. 11.)  GabMar Corp. "informed [drivers] both in writing and orally . . . to take their rest and meal breaks."  (Pinato Decl. ¶ 15 & Ex. B at 13, Ex. 13.) Mr. Scott's managers told him to take breaks for safety reasons.  (Scott Dep. 73:11-14, Ex. 39.) Mr. Gastélum was instructed to take half-hour lunches and other breaks.  (Gastélum Decl. ¶ 6, Ex. 20.)

The evidence also shows that many drivers <u>did</u> take breaks. For example, Mr. Gallegos took both his 30-minute break and also stopped for coffee or food.  (Gallegos Decl., ¶ 12, Ex. 27.)  Mr. Scott would take longer than 30-minute breaks "if I am feeling tired or not up to par."  (Scott Dep. 72:20–73:14, Ex. 39.)  Others chose to voluntarily forgo breaks to more quickly finish their work day.  (*E.g.*, Pinato Decl. ¶ 16, Ex. 13.)  Mr. Arballo, for instance, could take breaks but did not take them "all the time."  (Arballo Dep. 52:1-15, Ex. 44; *see also* Kennedy Dep. 62:16-20, Ex. 52.)  Mr. Johnson "just would not take [breaks] anyway" because "I'm more concern[ed] with finishing the route and doing what I can to get home."  (Johnson Dep. 67:4-14, Ex. 40.)  But he would meet his wife at Starbucks or somewhere else about once a week for lunch.  (*Id*. at 68:8-20.)  Mr. Seuth admitted he could have taken breaks and sometimes had routes of less than six hours, but still chose not to take breaks.  (Seuth Dep. 70:1–73:16, Ex. 45.)  Still others were paid meal and rest break premiums when they forewent breaks. (*See* Lopez Decl. ¶ 16, Ex. 14.)

Plaintiffs cannot prove a Service Provider's liability, much less FedEx Ground's liability, with anecdotal evidence that some drivers did not take breaks. An employer must make meals and rest periods <u>available</u>, but need not ensure employees actually take those breaks. *See Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1039-40 (2012) ("[T]he employer is not obligated to police meal breaks and ensure no work thereafter is performed."). "Even if every single one of these accounts [in the affidavits] were true, that would not demonstrate that" every Service Provider "'operate[s] under a [common] general policy," *Dukes*, 564 U.S. at 358, particularly given the evidence that many drivers did take breaks. *E.g.*, *Pavloff v. Cardinal Logistics Mgmt. Corp.*, No. CV 20-00363 PA (KKx), 2020 WL 6821072, at *10 (C.D. Cal. Oct. 7, 2020) (no predominance for break claims in part because "the evidence provided shows that [some drivers] did take rest breaks").

Rather than show any common policy applicable to all drivers, Plaintiffs argue they can prove their claims because FedEx Ground did <u>not</u> have a break policy. (Pls.' Mem. 22–24.) That argument presupposes FedEx Ground employs all of the drivers and that every Service Provider failed to make legally-required breaks available. Plaintiffs cannot prove either on a class basis.[21] The "discretion" afforded Service Providers does not support class treatment. *Cf. Dukes*, 564 U.S. at 355 ("discretion by local supervisors . . . is just the opposite of a uniform employment practice").

Plaintiffs also argue that FedEx Ground's "practices" made putative class members "too busy" to take breaks. (Pls.' Mem. 22–24.) But they proffer no evidence showing any FedEx Ground practice caused all drivers to be "too busy," or that all or most drivers felt too busy. Service Providers decided how many drivers to employ and then set drivers' schedules and routes. Whether any individual driver was "too busy" to take breaks will vary by Service Provider and even among drivers employed by the same Service Provider. (*See* Facts § F, *supra*; Apps. A; C, D.) Many drivers had time to take breaks and did. (*E.g.*, Gastélum Decl. ¶ 7, Ex. 20; Barker Dep. 66:22–67:24, Ex. 54; Rasmussen Decl. ¶ 5, Ex. 18.) And many declarants who claimed to have worked 60-plus hours per week and said they were too busy to stop for breaks actually worked substantially fewer

---

[21] Even if they could, that would not establish liability because joint employers do not share joint liability. (*See* ECF No. 105 (Labor Code section for breaks does not permit joint-and-several liability).) Plaintiffs have no evidence that FedEx Ground was put on notice of missed breaks.

hours.  (*E.g.*, Kim Decl. ¶ 7, Ex. 5 ("Mr. Warner falsely states that he 'typically' worked 12 hours per day and 60 hours per week. He did not. In fact he did not work 60 hours in any single week."); Clere Decl. ¶ 12, Ex. 11 (Mr. Grigoryan "never worked more than 50 hours or more in a week").) Plaintiffs' too-busy-for-breaks theory cannot be proved on a classwide basis.

Dr. Drogin's statistical analysis also fails to establish any common break policy or practice. First, Dr. Drogin cannot say whether drivers were provided with a break opportunity and elected not to take it.  (Crandall Decl. ¶ 20, Ex. 3; Drogin Dep. at 28:22–29:24, Ex. 69.)  Instead, he simply looks for "gaps" of 30 minutes or more in scanner activity between the first and last package delivery.  (Crandall Decl. ¶ 20, Ex. 3.)  Second, Dr. Drogin ignored varied and sometimes lengthy periods before delivery of the first package and after delivery of the last package, during which drivers could have taken meal breaks.  (*Id.* (finding 30 minute gaps in approximately 33% of shifts Dr. Drogin identified as "no gap").)  Third, Dr. Drogin's analysis provides no support for Plaintiffs' contention that drivers were "too busy" to take breaks.  (*Id.* ¶ 21.)  He did not analyze work-load, including number of stops or package drop-offs, or consider what time drivers' shifts ended.  (*Id.*) Thus, although Dr. Drogin's analysis indicates that 43.9% of shifts between five and six hours did not include a "gap" from which he would infer a lunch break, Dr. Drogin fails to account for the fact that many of those drivers returned to their terminal before 4:30 p.m. (72.6% of shifts) or 3:30 p.m. (39.1%).  (*Id.* ¶ 24.)  If drivers chose not take lunch breaks during 5-6 hour shifts ending before 4:30 in the afternoon, that decision plainly was not the result of "time pressure."[22]

Courts have rejected similar evidence and arguments.  In *Washington v. Joe's Crab Shack*, this Court held common questions did not predominate when "the only way of answering the question regarding the operation of a policy or practice . . . would be through individualized analyses of why, in each instance, a particular employee did or did not take breaks, and if he/she did or did not take breaks."  271 F.R.D. at 640.  Similarly, in *Santos v. United Parcel Service, Inc.*, the court

_____

[22] Dr. Drogin's analysis contains additional errors.  For example, in analyzing linehaul data, he failed to consider whether driving shifts occurred in California.  (Crandall Decl. ¶¶ 55-56.)  Dr. Drogin also inexplicably dropped 6,251,906 records, comprising 27% of the sample, from his analysis.  (*Id.* ¶ 57.)  He also incorrectly counted shifts by including 24-hour periods in a sleeper birth (where no work was performed), and by defining "shifts" by calendar day, thereby failing to properly count shifts spanning midnight.  (*Id.* ¶ 58.)

declined to certify break claims where the claim of a "consistent practice" was based on flawed statistical analysis and "the testimony of 9 individuals out of over 2,000 workers." No. 3:18-cv-03177-EMC, 2020 WL 6784220, at *3–7 (N.D. Cal. Nov. 18, 2020). And in *Zayers v. Kiewit Infrastructure West Co.*, the court ruled that whether employees were "too busy" for breaks was "not subject to common proof and requires individualized inquiry into each employee's break decisions each shift." No. 16-CV-06405 PSG (PJW), 2017 WL 4990460, at *4 (C.D. Cal. Oct. 26, 2017).[23]

Plaintiffs argue "it is no defense that employees 'chose' to forgo [breaks]" (Pls.' Mem. 28), but that argument is wrong, too. Plaintiffs rely on *Alberts v. Aurora Behavioral Health Care*, but the plaintiffs there showed the defendant's policies rendered illusory the employees' ability to take meal and rest breaks, so the court could not simply "conclude employees voluntarily chose to skip those breaks."[24] 241 Cal. App. 4th 388, 410–11 (2015). The same is not true here.

Further, *Benton v. Telecom Network Specialists, Inc.*, a staffing company case, involved an alleged joint employer who "dictated the technicians' day-to-day working conditions, including whether and when the employees could take breaks," "was solely responsible for instructing technicians how to report their time, including whether and how to record break periods," and the "staffing companies had no way of knowing or controlling whether technicians' took their meal and rest breaks." 220 Cal. App. 4th 701, 714–15 (2013). Notably, that court stated "it is conceivable that, under certain circumstances, a joint employer could satisfy its affirmative meal and rest obligations by delegating those duties to a coemployer." *Id.* at 728. Even if FedEx Ground was a joint employer, it could properly delegate meal and rest obligations to the Service Providers.

Plaintiffs claim no time spent in the sleeper berth by linehaul subclass members can qualify as a "break," and thus there is at least a common issue for the subclass. (Pls.' Mem. 23 n.5.) But

---

[23] *See also Campbell v. Best Buy Stores, L.P.*, No. LA CV12-07794 JAK, 2013 WL 5302217, at *13 (C.D. Cal. Sept. 20, 2013); *Gonzales v. Officemax N. Am.*, Nos. SACV 07-00452 JVS, CV 07-04839 JVS (MLGx), 2012 WL 5473764, at *5 (C.D. Cal. Nov. 5, 2012).

[24] Plaintiffs' other cases involve a common uniform policy or practice at a single location. *Shaw v. AMN Healthcare, Inc.*, 326 F.R.D. 247, 251, 256 (N.D. Cal. 2018); *Brewer v. Gen. Nutrition Corp.*, No. 11-CV-3587 YGR, 2014 WL 5877695, at *6 (N.D. Cal. Nov. 12, 2014); *Pina v. Con-Way Freight, Inc.*, No. C 10-00100 JW, 2012 WL 1278301, at *7 (N.D. Cal. Apr. 12, 2012).

they do not show how they can prove class liability.[25]  Many Service Providers compensate drivers for sleeper-berth time.[26]  (App. D)  And whether drivers were paid for, or engaged in personal activities during, sleeper-berth time is an individual inquiry.  *Pavloff*, 2020 WL 6821072, at *8 (no predominance; some drivers "spent time logged as 'sleeper berth' engaged in personal activities").

### 2.     Whether a P&D Driver's Break Claims Are Preempted Is Individualized

In 2018, the FMCSA determined that federal law preempts California's meal and rest break rules as applied to property-carrying drivers covered by the federal Hours of Service regulations. *See* Cal.'s Meal & Rest Break Rules for Commercial Motor Vehicle Drivers; Petition for Determination of Preemption, 83 Fed. Reg. 67470-01 (Dec. 28, 2018).  The Ninth Circuit upheld this order, ruling that "the agency's decision reflects a permissible interpretation of the Motor Carrier Safety Act of 1984." *Int'l Bhd. of Teamsters, Local 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 849–58 (9th Cir. 2021).  The FMCSA order, therefore, prevents the Court from <u>enforcing</u> California meal and rest break laws as to those drivers covered by the federal Hours of Service regulations.  *See* 49 U.S.C. § 31141 (state law deemed preempted by the Secretary of Transportation "may not be enforced"); *Sales v. United Road Servs., Inc.*, No. 19-cv-08404-JST, 2020 WL 4035072, at *3 (N.D. Cal. July 17, 2020) ("While the conduct giving rise to Plaintiffs' claims occurred prior to the issuance of the FMCSA Order, '[t]he Court *currently* has no authority to enforce the regulations' under which Plaintiffs bring their claims.").  Thus, drivers who drove "heavy vehicles" more than a *de minimis* amount cannot pursue their California break claims.  *See Sweet v. United Parcel Serv., Inc.*, No. CV 09-02653 DDP (RZx), 2010 WL 11507624, at *4 (C.D. Cal, Oct. 13, 2010).

This applies to <u>all</u> linehaul subclass drivers because they always drove heavy vehicles.  Whether it applies to P&D drivers requires individual inquiries that defeat predominance.  Individual inquiries are required to determine vehicle-weight information for each vehicle for each driver, and

---

[25] In any event, meal and rest break claims for the linehaul subclass are preempted for the same reasons that some P&D driver's claims are preempted.  (*See* Argument, § III.A.2, *infra*.)

[26] *E.g.*, Salas Dep. 54:1-24, 84:18-24, Ex. 46 (Service Providers paid him a per diem for breaks); Ferras Dep. 42:24–43:9, 69:17-24, Ex. 36 (admitting he was paid for sleeper-berth time).

the number and frequency of trips each driver drove a heavy vehicle. Contrary to Plaintiffs' assertion (Pls.' Mem. 23), scanner data does <u>not</u> show vehicle weights; it shows vehicle numbers that then must be searched in a separate system where weights often are missing due to incomplete data entry by Service Providers. (Kernan Decl. ¶¶ 6, 8-10, Ex. 2.) After all the individualized vehicle-weight evidence had been compiled, the Court would have to analyze, for each driver, whether their use of heavy vehicles was more than *de minimis*. Only then could the Court <u>begin</u> to evaluate purported evidence of missed breaks. This individualized inquiry defeats predominance. *Cf. In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 621 (N.D. Cal. 2010) ("How would the finder of fact accurately separate the one exempt [employee] from the nine nonexempt [employees] without resorting to individual minitrials?").

### 3. *Plaintiffs' Break Claims Present Individualized Damages Issues*

To prove their claims and recover damages, Plaintiffs must prove that each driver was entitled to a break (and the number of breaks), did not have a reasonable opportunity for a break, did not actually take it, and did not receive compensation for missed breaks. Only then could the Court assess how many violations occurred and begin to determine damages. But Plaintiffs do not, and cannot, offer a classwide method to make these determinations.

Scanner data cannot be used to show whether breaks were taken because there is no way to record breaks on the scanners. (Means Decl. ¶ 34, Ex. 1.) Even if it could, the inquiry into who did and did not receive breaks and whether breaks were voluntarily missed remains individualized. *Cf. Washington*, 271 F.R.D. at 640 (even when computerized information is available, there may still be individualized inquires). For example, one driver allegedly worked <u>before</u> logging onto the scanner and worked one or two hours <u>after</u> logging out. (Barsz Dep. 40:11-17, 41:18-42:7, 53:14-54:2, Ex. 61.) Another driver repeatedly visited his ill father during the workday and did not log out of the scanner first. (Sheban Decl. ¶ 12, Ex. 6.) Scanner data simply cannot answer these questions, which would instead require driver testimony and other individualized proof.

*Forrand v. Federal Express Corp.* is illustrative. The court denied certification for break claims because of a "fatal problem"—"the need for individualized fact inquiries dominates the determination of liability and damage issues." No. CV 08-1360 DSF PJWX, 2013 WL 1793951, at

*5 (C.D. Cal. Apr. 25, 2013), *aff'd*, 614 F. App'x 905 (9th Cir. 2015). The plaintiff claimed she "could not recall ever receiving an uninterrupted 30 minute lunch break" and provided a declaration of a former FedEx Express manager, testimony of a FedEx Express employee, and analysis of data purporting to show that 23.1% of unpaid breaks were interrupted. *Id.* That method of proof was inadequate because she did not prove that FedEx Express "knew or reasonably should have known that the worker was working through the authorized meal period." *Id.* Critically, the court noted the Federal Express DOT scanner data did <u>not</u> record breaks. *Id.*

Plaintiffs argue that individualized damages calculations do not overwhelm common issues, citing to *Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013). But *Leyva* involved unique circumstances. There was a single employer with a uniform practice of rounding up employee start times to the next half hour for purposes of pay. *Id.* at 514. The employer's "computerized payroll and time-keeping database would enable the court to accurately calculate damages and related penalties for each claim." *Id.* Those factors are not present here, and individualized damages predominate. *See Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 130–31 (N.D. Cal. 2014) (denying certification where the "situation is considerably more complicated" than *Leyva*).

### B. Individualized Issues Predominate for the Fraud and Conversion Claims

Individualized questions also defeat predominance for Plaintiffs' claims related to denial of benefits. First, as a threshold matter, they would have to show classwide evidence of joint employment, which they cannot do.

Second, assuming ERISA applies, each driver would have to show she administratively exhausted her request for ERISA benefits from FedEx Ground and was denied, an inherently individualized inquiry. *See Burds v. Union Pac. Corp.*, 223 F.3d 814, 817 (8th Cir. 2000) (nurses claiming misclassification had to administratively exhaust their request for ERISA benefits); *Amato v. Bernard*, 618 F.2d 559, 566–68 (9th Cir. 1980) (applicant seeking ERISA benefits must administratively exhaust claim). Many drivers have not done so, including one named Plaintiff.[27]

Third, for Plaintiffs' fraud claim, they must prove reliance, which cannot be done with

---

[27] Sobaszkiewicz Decl. ¶ 48, ECF No. 287-2; Kennedy Dep. 83:25-84:8, Ex. 52; Scott Dep. 80:16-19, Ex. 39; Smock Dep. 80:16-19, Ex. 50.

classwide evidence. *See Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 651 (C.D. Cal. 1996) (individualized issues in fraudulent misrepresentation claim); *Akkerman v. Mecta Corp.*, 152 Cal. App. 4th 1094, 1103 (2007) (each class member "would have to prove his individual claim for restitution by establishing reliance and causation."). Each driver would have to prove reliance <u>on a statement by FedEx Ground</u>, but their evidence is consistent that it was the Service Providers who told drivers they were not FedEx Ground employees. (*E.g.*, Prasad Decl. ¶¶ 13-14, Ex. 7 (Service Provider's handbook told employees "[y]ou are an employee of SVL and not FedEx Ground").)

Fourth, determining damages for fraud and conversion requires individual inquiries into whether any driver suffered damage by justifiably relying on any purported misrepresentation. *Cf. Yastrab v. Apple*, 173 F. Supp. 3d 972, 978 (N.D. Cal. 2016). Some drivers might have turned down benefits because their Service Provider already offered them (*see* Facts § A, *supra*), or because they already were covered through their spouse or as a veteran. (*E.g.*, Martinez Decl. ¶ 35 (insurance through spouse), ECF No. 287-2; Ginn Dep. 30:20–31:24, Ex. 35 (insurance as a veteran).) Other drivers could have opted out for other reasons. (Gastélum ¶ 5, Ex. 20 (chose not to participate in 401(k)).) These individualized issues defeat predominance for the fraud and conversion claims.

## C. Individualized Issues Predominate on Wage Statement Claims

To prove liability and damages for wage statement claims, Plaintiffs and drivers must first prove joint employment, then prove violations occurred, and then prove how many violations occurred. Service Providers have different wage statement practices, so there is no classwide method to prove liability. Moreover, statutory penalties differ depending on the number of wage statements that do not conform to the law. Since Service Providers have different pay periods (e.g., weekly, biweekly, *see* Apps. A, C, D)), there is no classwide method to calculate penalties either.

Whether class members have been harmed is an individual inquiry, too. Like the plaintiff in *Mejia v. Farmland Mutual Insurance Co.*, Plaintiffs have "failed to explain why the [information] provided by Defendants is not useful for filing grievances, or for unemployment insurance or income tax purposes," which is the purpose of including an employer on a wage statement. No. 2:17-cv-00570-TLN-KJN, 2018 WL 3198006, at *7 (E.D. Cal. June 26, 2018).

## D. Individual Issues Predominate the Derivative UCL Claim

25

There is no basis for certifying a derivative UCL claim when the underlying claims are not certifiable. *Moore v. Int'l Cosmetics & Perfumes, Inc.*, No. ED-CV 14–1179 DMG (DTBx), 2016 WL 7638182, at *3 (C.D. Cal. Aug. 23, 2016) (no need to separately address derivative UCL claim).

### E. Plaintiffs Fail to Meet Predominance for Additional Reasons

#### 1. *The linehaul subclass raises individual choice-of-law issues*

Linehaul drivers typically drive between states. (Means Decl. ¶ 14, Ex. 1.) "There is no single, all-purpose answer to the question of when state law will apply to an interstate employment relationship." *Pavloff*, 2020 WL 6821072, at *5 (quoting *Ward v. United Airlines, Inc.*, 9 Cal. 5th 732, 751 (2020)). And the California Supreme Court has rejected the argument that "the overtime laws of the employees' home state necessarily follow them." *Ward*, 9 Cal. 5th at 751. This means multiple states' laws could apply to linehaul drivers like Plaintiff Sobaszkiewicz, who frequently drove from California to Florida and back (Sobaszkiewicz Decl. ¶ 26, ECF No. 287-2), or Plaintiff Overpeck, who worked out of a New Jersey station (Overpeck Dep. 50:11-25, Ex. 70). The individualized choice-of-law inquiries further fragment the putative linehaul subclass.

The choice-of-law analysis also is different for each Labor Code violation. *Ward*, 9 Cal. 5th at 752. The Court would have to make individualized choice-of-law determinations for each linehaul subclass member <u>and for each claim for each subclass member</u>. Those inquiries would overwhelm any purportedly common question. *See Pavloff*, 2020 WL 6821072, at *8 (denying certification for interstate drivers because "determining whether the various California laws at issue apply to all members of the two proposed classes is a predominant issue in this case that requires the separate adjudication of each individual proposed class member's claims").

#### 2. *Individual issues predominate because some drivers signed arbitration agreements or already settled their claims*

Some putative class members cannot litigate their claims in federal court because they signed arbitration agreements with their Service Providers.[28] (*E.g.*, Pinato Decl. ¶ 20 & Ex. B at 5, Ex. 13).)

---

[28] The Labor Code precludes submitting <u>wage</u> claims to arbitration (Cal. Lab. Code § 229), but Plaintiffs' claims are not for "wages" but meal-and-rest-period premiums, wage statement penalties, and benefits. *See, e.g.*, *Lane v. Francis Capital Mgmt. LLC*, 224 Cal. App. 4th 676, 684 (2014).

Because an alleged joint employer who did not sign the employee's arbitration agreement can still compel arbitration of employment claims, *see Franklin v. Cmty. Reg'l Med. Ctr.*, No. 19-17570, 2021 WL 2024516, at *7 (9th Cir. May 21, 2021), this presents another individualized issue and a significant trial manageability problem.

Further, some drivers—including Plaintiff Sterling—already settled at least some of their claims with their Service Provider. (*E.g.*, Sterling Dep. 11:19–12:5, 17:10-23, Ex. 72 (admitting that he settled his unpaid wage claim with one prior Service Provider employer); Dane Dep. 70:3-14, Ex. 87 (same); Zheng Decl. ¶¶ 6-11 & Ex A, Ex. 77; *cf.* K. Williams Dep. 7:20–8:6, Ex. 49 (already has a wage claim pending against Service Provider).) Determining which drivers have settled claims, and whether those claims preclude their participation here, is inherently individualized.

## IV. THE PROPOSED CLASS ACTION IS NOT SUPERIOR TO INDIVIDUAL OR SMALL GROUP ACTIONS AGAINST SERVICE PROVIDERS

Plaintiffs fail to establish "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). They offer no evidence that class members lack a desire to "individually control[]" their actions and pursue claims for wages owed, minimum wage, and overtime. Nor do Plaintiffs prove the parties and the Court could overcome "the likely difficulties in managing a class action." *See* Fed. R. Civ. P. 23(b)(3).

### A. Individual or Group Actions Against Service Providers Is a Superior Option

Rather than pursue a statewide class of linehaul and P&D drivers with hundreds of different employers and varying work experiences, the superior method to pursue aggrieved drivers' claims is via individual or small group actions directly against Service Providers in state court. Drivers who feel they have been wronged have an interest in "controlling the prosecution" of their cases. *See* Fed. R. Civ. P. 23(b)(3)(A); *Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 485 (N.D. Cal. 2017). They also have an interest in pursuing their wage claims, which Plaintiffs have waived without class members' knowledge. Further, drivers have an interest in causing their Service Providers to change any noncompliant practices.[29] Still further, Plaintiffs strategically chose to pursue unviable claims

---

[29] FedEx Ground cannot change Service Providers' policies, except in more indirect ways like terminating contracts with Service Providers or seeking indemnification from Service Providers.

on a class basis (e.g., meal and rest break claims by individuals who drive heavy vehicles) while declining to bring potentially viable claims against Service Providers directly for unpaid wages.

Plaintiffs argue a statewide class action against FedEx Ground is superior because "the cost of individual actions would be prohibitively high." (Pls.' Mem. 29.) This is not true and ignores that drivers can (and do) sue Service Providers both in individuals and in groups. (*E.g.*, Zheng Decl. ¶¶ 6-11 & Ex A, Ex. 77.) Relevant statutes also permit recovery of substantial penalties, attorney's fees, and costs, incentivizing drivers and their lawyers to pursue modest damages claims. *See* Cal. Lab. Code §§ 218.5, 226(e)(1), 1194 (recovery of fees and costs), 226(e) (up to $4,000 penalty per person); *Marquez v. NLP Janitorial, Inc.*, No. 16-cv-06089, 2019 WL 652866, at *11 (N.D. Cal. Feb. 15, 2019) ($151,564.37 in attorney's fees and costs for Labor Code claims worth $91,581.19). Wronged drivers "have a stronger interest in controlling the prosecution of individual actions because their individual monetary claims are likely to be substantial (which gives each class member an incentive to bring an individual suit)." *Daniel F.*, 305 F.R.D. at 132.

Drivers can obtain faster, complete relief (including for unpaid wages) from their Service Providers. Indeed, drivers have done so. (*E.g.*, Sterling Dep. 11:19–12:5, 17:10-23, Ex. 72.) Given that, and the availability of statutory penalties and fee-shifting, individual and small group actions against Service Providers are far more efficient, economical, and superior.

**B. Plaintiffs' Proposed Class Action Is Unmanageable**

**1. *Plaintiffs propose no manageable way to try this case as a class action***

Courts have denied class certification where the plaintiffs "lack any type of trial plan or procedure," *Badella v. Deniro Mktg. LLC*, No. C 10-03908 CRB, 2011 WL 5358400, at *13 (N.D. Cal. Nov. 4, 2011), or if that plan is deficient, *Weigele v. FedEx Ground Package Sys., Inc.*, 267 F.R.D. 614, 624–25 (S.D. Cal. 2010) ("substantial difficulties" with the number of witnesses and lack of clarity in "how a jury will be able to sort out the issues placed before it"). Plaintiffs' "trial plan" consists of a footnote at the end of their brief, stating "there are a variety of case management tools that may be applied," such as bifurcating the trial or splitting it into stages. (Pls.' Mem. 30 n.9.) They suggest one trial on the issue of joint employment, then subsequent trials to determine "liability and damages at later ***stages***." (*Id.* (emphasis added).) That is an admission that classwide

litigation inevitably will devolve into many trials.

Plaintiffs claim that bifurcation is "standard practice." (Pls.' Mem. 30 n.9.)  Sometimes employment class actions are "bifurcated into two stages"—one for liability and a second for damages. *See Barefield v. Chevron, U.S.A., Inc.*, No. C 86-2427 TEH, 1988 WL 188433, at *4 (N.D. Cal. Dec. 6, 1988).  But Plaintiffs propose an entirely new practice—<u>tri</u>-furcating the class action into one joint-employment trial, another trial for liability, and then <u>at least</u> one trial for damages (or maybe thousands of mini-trials).  They present no manageable way to determine liability and damages in one trial, and clearly cannot determine damages without mini-trials.

Plaintiffs claim that determining damages "will be manageable" by using DOT scanner data. (*See* Pls.' Mem. 28.)  As explained above, that is just wrong. (*See* Facts § F, *supra*.)  Even if DOT scanner data included drivers' compensable time, package delivery times, and the distance between stops, that would need to be calculated <u>for each and every driver for every day for the past six-plus years</u>.  There also would be no way to determine whether a driver was stuck in 15 minutes of stopped traffic or took a 15-minute break.  There would be no way to determine whether a driver took a 10- or 30-minute break before dispatch time while package handlers loaded the driver's vehicle.  For linehaul drivers, there are limited or no intermediary stops between destinations, and no data about whether a co-driver requested that the resting driver work.  Even then, if a missed break occurred, the Court would need to evaluate wage statements to determine if compensation was provided for a missed break.  And then determine if federal law preempted the California claim. Individualized inquiries are required for Plaintiffs' other claims too. Ultimately, the same individualized inquiries that defeat predominance also make a class trial unmanageable. *Cf. Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 651–52 (C.D. Cal. 1996) (even if only 25% of questions are "individual in nature [and] significant enough, class action treatment might not be 'superior'").

### 2. *Plaintiffs' proposed class presents ascertainability problems*

Plaintiffs do not—and cannot—identify which putative class members have viable claims. Predominance and superiority are not met if the class "sweeps in uninjured class members," *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 793 (9th Cir. 2021), if "individual trials are necessary to establish whether a particular [class member] suffered harm" from

the alleged misconduct," *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252 (D.C. Cir. 2013), or if there is no manageable methodology to identify uninjured class members. *See Bouaphakeo*, 577 U.S. at 460–61; *Olean*, 993 F.3d at 793 ("The district court's gloss over the number of uninjured class members was an abuse of discretion.").

Plaintiffs present no feasible way to determine which drivers have which claims. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (part of "assessing manageability" is analyzing administrative feasibility). For instance, it would take many months, at a minimum, to compile and review all vehicle weights driven by thousands of potential subclass members and then analyze the trips made by each driver to determine which P&D drivers may have meal-and-rest-break claims. (Means Decl. ¶ 39, Ex. 1.) Some drivers unequivocally say they took breaks[30]—and Plaintiffs present no way to avoid "sweep[ing] in" these uninjured individuals.

Further, determining whether California law applies to interstate linehaul drivers presents an ascertainability problem. (*See* Argument § III.E.3.) It is unclear whether named Plaintiff Overpeck is even subject to California law because he worked for a New Jersey-based Service Provider out of a New Jersey hub. (Overpeck Dep. 21:5-14 & Ex. 18 (Resp. to Interrog. No. 19), Ex. 70.)

## V. THE P&D SUBCLASS FAILS TO SATISFY RULE 23(a)(3) TYPICALITY

Plaintiff Sterling sued and settled with a Service Provider. (Sterling Dep. 11:19–12:5, 17:10-23, Ex. 72.) He claimed the Service Provider was solely responsible for Labor Code violations, including meal-and-rest breaks (*id.* at 17:10-23), which is inconsistent with the theory he advances here. Accordingly, he is not a proper class representative. *Cf. McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-CV-04457-YGR, 2016 WL 879784, at *7 (N.D. Cal. Mar. 8, 2016) (no typicality when theory of harm different than class theory); *Turner v. Diversified Adjustment Serv., Inc.*, No. 00 C 463, 2000 WL 748124, at *2 (N.D. Ill. May 31, 2000) (plaintiff's testimony, inconsistent with the theory of the case, defeated typicality and adequacy).

## <u>CONCLUSION</u>

For all of these reasons, the Court should deny class certification.

---

[30] *E.g.*, Jones Decl. ¶ 5, Ex. 4 ("Pacific Freight unequivocally permits and authorizes its drivers to take 30 minute meal breaks [and . . .] I have no difficulty taking my meal breaks when I want to.").

Dated: June 1, 2021                    FISHER & PHILLIPS LLP


                                By:  */s/ Christopher M. Ahearn*
                                     Brandy T. Cody
                                     James C. Fessenden
                                     Christopher M. Ahearn
                                     Sean F. Daley

                                     Attorneys for Defendant
                                     FedEx Ground Package System, Inc.