# EXHIBIT A

No *Shepard's* Signal™
As of: September 14, 2021 8:42 PM Z

# *Medina v. Equilon Enterprises, LLC*

Court of Appeal of California, Fourth Appellate District, Division Three

September 10, 2021, Opinion Filed

G058820

**Reporter**
2021 Cal. App. LEXIS 749 *

SANTIAGO MEDINA, Plaintiff and Appellant, v. EQUILON ENTERPRISES, LLC, Defendant and Respondent.

**Prior History: [*1]** Appeal from a judgment of the Superior Court of Orange County, No. 30-2010-00395208, William D. Claster, Judge.

**Disposition:** Reversed.

## Core Terms

stations, joint employer, employees, fuel, wages, hiring, wage order, independent contractor, working conditions, gas station, fired, exercise control, summary judgment, reimbursement, courts, trial court, terminate, training, misclassification, violations, clusters, entity, tasks, tests

**Counsel:** Bleau Fox, Samuel T. Rees; Lichten & Liss-Riordan, and Shannon Liss-Riordan for Plaintiff and Appellant.

Reed Smith and Raymond A. Cardozo for Defendant and Respondent.

**Judges:** Opinion by Thompson, J., with Bedsworth, Acting P. J., and Moore, J., concurring.

**Opinion by:** Thompson, J.

## Opinion

**THOMPSON, J.**—Plaintiff Santiago Medina appeals from a summary judgment entered against him and in favor of his putative joint employer, defendant Equilon Enterprises, LLC (Shell), which is a Shell Oil Company subsidiary doing business as Shell Oil Products US.

Shell owned gas stations and operated them through contracts with separate companies called MSO operators, one of which employed plaintiff as a gas station cashier and manager. Plaintiff sued the MSO operator and Shell, alleging violations of the Labor Code and arguing that Shell was his joint employer, based upon Shell's strict control over the operations of its gas stations. Relying on two prior published decisions of our sister courts of appeal involving similar claims, *Curry v. Equilon Enterprises, LLC (2018) 23 Cal.App.5th 289 [233 Cal. Rptr. 3d 295] (Curry)* and *Henderson v. Equilon Enterprises, LLC (2019) 40 Cal.App.5th 1111 [253 Cal. Rptr. 3d 738]* (*Henderson*), Shell moved for summary judgment, arguing Shell was not plaintiff's **[*2]** employer as a matter of law. The trial court concluded it was bound by these prior decisions and granted the motion.

We reverse. The facts presented by plaintiff in this case, particularly with respect to the degree of Shell's control over the MSO operators and gas station employees like plaintiff, differ meaningfully from the facts set forth in the two prior opinions. In addition to these factual distinctions, we also disagree with the analysis of our sister courts on the application of the relevant tests for joint employer status to Shell's operation. We conclude the undisputed facts presented in Shell's motion show Shell both indirectly controlled plaintiff's wages and working conditions and suffered or permitted plaintiff to work at Shell's stations, either of which is enough to make Shell plaintiff's joint employer.

## FACTS

Shell was the owner of more than 300 Shell branded gas stations in California.[1] The operation of these stations was conducted through what Shell calls its "Multi-Site Operated" or "MSO" model. Under the MSO model, for each station Shell entered a set of nonnegotiable form agreements with an "MSO

---

[1] In 2007, Shell sold most of its stations to Tesoro Corporation. The station at which plaintiff worked was one of a few stations Shell kept and continued to operate.

operator," which, in turn, operated the station. The agreements created **[*3]** a lease of the station's convenience store and car wash to the operator for certain monthly rent and required the operator's employees to perform all work at the station, including the motor fuel services which were outside the lease. For the fuel services, the operators received a $2,000 monthly fee and a reimbursement amount unilaterally set by Shell, which was designed primarily to reimburse the operator for its labor expenses. Typically, these stations were leased as groups in nonnegotiable "clusters." The MSO contracts could be terminated by Shell on six months' notice, though stations could be added or withdrawn from the operator's cluster at any time, for any reason.

The MSO operators were required to use Shell's electronic point of sale cash register system, with the proceeds paid directly to Shell, not to the operator. The operators were required to follow "detailed terms for the operation of [Shell]'s motor fuel business," which were set forth in manuals and guides provided by Shell. They were also required to provide daily reports and submit to periodic inspections by Shell. Shell required the operators to grant Shell access to the operators' bank accounts, so that Shell **[*4]** could unilaterally withdraw fuel revenue from the account and deposit revenue from convenience store sales and car washes. Shell controlled the hours of the stations (open 24 hours a day, 7 days a week, 365 days a year unless precluded by local law) and retained the right to audit all operator payroll records and to "remove" any operator employee for good cause.

The MSO contract called for the operators to hire, fire, train, discipline, and maintain payroll records for their own employees, and provided "detailed instructions for compliance with labor laws." The operators "did not have discretion to modify the tasks set forth in the MSO contract and manuals," which were performed by their employees. These tasks included checking Shell's fuel measurement equipment, conducting regular local gas price surveys to allow Shell to set a fuel price, collecting and providing a daily account to Shell for fuel revenue, serving Shell fuel customers, wearing a Shell uniform, cleaning and maintenance of all kinds (including some cleaning and maintenance of the fuel equipment), performing fuel inventory control, and running and documenting pump tests and calibration. Fuel revenue accounted for over **[*5]** 80 percent of the revenue generated from a typical Shell station.

Shell did not always run its stations this way. Before 2002, Shell operated some stations through contractors, but also operated many stations itself, using its own employees. In late 2002 and 2003, Shell switched all its stations to the MSO model, making the operators the employers of the station workers, rather than Shell.

Plaintiff was a cashier and later a station manager at a Shell station operated by R&M Enterprises[2] (R&M), an MSO operator. Upon his promotion to station manager, plaintiff was designated a salaried employee by R&M, and worked in excess of eight hours a day and forty hours a week without overtime pay until a California Division of Labor Standards Enforcement audit in 2008 prompted his reclassification. Plaintiff was trained on Shell's "Customer Value Proposition Reference Guide" by certain Shell employees. Plaintiff testified that during the course of this training one of the Shell employees told plaintiff "you have no idea how many managers I have fired over not complying with these policies." Plaintiff also testified a Shell employee responding to a customer complaint told him "I would hate to have **[*6]** you fired over such a thing. I believe you're a good manager. But believe me, I have the power to get you fired. Please correct this attitude."

Plaintiff was always paid directly by R&M, never by Shell. Plaintiff received no employment benefits directly from Shell. R&M determined whether plaintiff was exempt or nonexempt, and controlled his compensation and benefits. R&M withheld federal and state payroll taxes, paid workers' compensation premiums, and provided plaintiff with his W-2. Plaintiff entered a written at-will employment agreement with R&M. While employed with R&M, plaintiff took direction from R&M supervisors and its owner, and typically reported to his R&M supervisor, though he also reported certain issues directly to Shell when the Shell manual or MSO contracts called for such direct reporting. R&M personnel discussed plaintiff's job performance with plaintiff, though plaintiff also sometimes received direct instructions on compliance with the MSO contract from the Shell area manager.

Plaintiff was terminated by R&M in December 2008. Plaintiff thereafter filed a claim against R&M with the Department of Industrial Relations, Division of Labor Standards Enforcement for unpaid **[*7]** wages, and later sued R&M and Shell.

---

[2] R&M Enterprises was a defendant in the action below but is not a party to this appeal.

**PROCEDURAL HISTORY**

Plaintiff and then-coplaintiff Raymond Stoddard[3] sued Shell and R&M in 2012 as name plaintiffs of a putative class. Plaintiff alleged Shell was his joint employer along with R&M. Plaintiff asserted causes of action against Shell and R&M for misclassification, failure to pay overtime wages, failure to pay missed break compensation, and violation of California Business and Professions Code section 17200. Plaintiff's case was stayed for several years pending the results of other class actions against Shell pending elsewhere in California which raised the same issues. One of those class actions, *Curry*, proceeded to summary judgment for Shell, which was affirmed on appeal in a published decision by the Court of Appeal, Fourth District, Division Two. (Curry, supra, 23 Cal.App.5th at p. 316.)

After the *Curry* decision, the trial court lifted the stay in plaintiff's case and ordered the parties to provide a plan "for expeditiously raising the joint employment claim in light of [the *Curry* case], which the Court believes is binding on it in this Action." Shell then brought a summary judgment motion on stipulated facts and documents, arguing Shell was not plaintiff's joint employer under *Curry*. Plaintiff opposed the summary judgment **[*8]** argument, contending principally that *Curry* was wrongly decided, citing a contrary Ninth Circuit case (Vazquez v. Jan-Pro Franchising International, Inc. (9th Cir. 2019) 923 F.3d 575, rehg. granted Sept. 24, 2019). While the motion was pending, the First District Court of Appeal decided *Henderson*, another joint employer Shell case, and held Shell was not an MSO operator's employee's joint employer.

The trial court concluded *Curry* and *Henderson* were indistinguishable from the present case and bound the trial court regardless of the Ninth Circuit's position, and accordingly granted summary judgment to Shell. Plaintiff timely appealed.

**DISCUSSION**

On appeal, plaintiff reasserts his arguments against *Curry* and *Henderson*, arguing we should apply the "ABC" test from Dynamex Operations West, Inc. v. Superior Court (2018) 4 Cal.5th 903 [232 Cal. Rptr. 3d 1, 416 P.3d 1] (*Dynamex*) to the joint employer question and pointing out that, unlike the trial court, we are not bound by *Curry* and *Henderson*. In the alternative, plaintiff argues Shell is his joint employer even under pre-*Dynamex* law. Shell argues *Curry* and *Henderson* are correct, and that Shell is not a joint employer of the employees hired by its MSO operators as a matter of law.

As this is a summary judgment case, our review is de novo and we liberally construe the evidence in support of the party opposing summary judgment **[*9]** and resolve any doubts concerning the evidence in favor of that party. (Miller v. Department of Corrections (2005) 36 Cal.4th 446, 460 [30 Cal. Rptr. 3d 797, 115 P.3d 77].)

1. *Pre-Existing Legal Standards for Joint Employment*

The controlling case on joint employment in California is *Martinez v. Combs* (2010) 49 Cal.4th 35 [109 Cal.Rptr.3d 514, 231 P.3d 259] (*Martinez*). Under *Martinez*, employer status for wage-and-hour purposes (including joint employer status) is controlled by the Industrial Welfare Commission's wage orders. (*Martinez, at p. 66.*) Wage Order No. 7, which applies to plaintiff, defines employment in the same manner as Wage Order No. 14, which the Supreme Court interpreted in *Martinez*. (*Cal. Code Regs., tit. 8, §§ 11070, subd. 2(D), (F), 11140, subd. 2(C), (F).*) *Martinez* describes this standard as consisting of three alternatives: (1) to exercise control over wages, hours, or working conditions, directly or indirectly, or through an agent or any other person; (2) to "suffer or permit to work"; or (3) to engage. (*Martinez, at p. 64.*) The first and third standards are self-explanatory, but further comment is necessary on the second standard, to "suffer or permit to work."

The "suffer or permit to work" definition of employment originates from early 20th-century statutes prohibiting child labor. (*Martinez, supra*, 49 Cal.4th at p. 69.) The definition was designed to reach situations where no common law employment relationship existed, but the defendant **[*10]** nonetheless failed to prevent child labor from occurring within his or her business. (*Id. at p. 58.*) As the Supreme Court noted in its subsequent *Dynamex* decision, the "suffer or permit to work" definition is extraordinarily broad, reaching "*all* individual workers who can reasonably be viewed as '*working in the* [hiring entity's] *business.*'" (Dynamex, supra, 4 Cal.5th at p. 953, original italics.) "A proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power

---

[3] Plaintiff Stoddard died during the pendency of this action and is not a party to this appeal.

to do so." (*Martinez, at p. 69.*) Under the "suffer or permit to work" standard, "the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring." (*Id. at p. 70*, original italics.)

2. Dynamex

In *Dynamex*, the Supreme Court analyzed the application of *Martinez* and the Industrial Welfare Commission's wage orders *outside* the joint employer context. The issue in *Dynamex* was independent contractor misclassification—the plaintiffs (delivery drivers) alleged they were misclassified as independent contractors rather than employees and thus were illegally denied the benefits of **[*11]** certain sections of the Labor Code. (*Dynamex, supra, 4 Cal.5th at p. 914*.) The plaintiffs contended the definition of employment for this purpose was the three tests set forth in the wage orders and applied in the joint employer context in *Martinez.* (*Id. at p. 914*.) The defendant argued the wage order definitions and the *Martinez* decision applied only to the joint employer question, not to independent contractor misclassification allegations. (*Id. at p. 915*.)

The Supreme Court concluded at least the very broad "suffer or permit to work" definition applied in the independent contractor misclassification context, but also concluded that the definition was "a term of art that cannot be interpreted literally in a manner that would encompass within the employee category the type of individual workers, like independent plumbers or electricians, who have traditionally been viewed as *genuine* independent contractors who are working only in their own independent business." (*Dynamex, supra, 4 Cal.5th at p. 916*, original italics.) Instead of applying the broad "suffer or permit to work" definition literally, the Supreme Court adopted the "ABC" test, which had been adopted by other jurisdictions specifically to distinguish employees from independent contractors. (*Ibid.*)

The ABC test has three **[*12]** prongs: "a worker is properly considered an independent contractor to whom a wage order does not apply only if the hiring entity establishes: (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity." (*Dynamex, supra, 4 Cal.5th at pp. 916–917*.) This version of the ABC test, which the Supreme Court established as the controlling test for independent contractor misclassification in California, was derived from the Massachusetts version of the ABC test. (*Id. at p. 956, fn. 23*.)

The Supreme Court viewed the ABC test as deriving from the wage order's "suffer or permit to work" language, reflecting its intentions and objectives. (*Dynamex, supra, 4 Cal.5th at pp. 958–962*.) But as the Supreme Court's refusal to apply that language "literally" suggests, the ABC test is either a narrowing or a context-specific application of the "suffer or permit to work" definition of employment. In the joint **[*13]** employer context, *Martinez* does not suggest we should narrow the "suffer or permit to work" definition or apply a context-specific test outside the context in which it was adopted. Instead, we read *Martinez* as requiring us to apply the "suffer or permit to work" test in its broad, literal sense: "We see no reason to refrain from giving [the 'suffer or permit to work'] definition of 'employ' its historical meaning." (*Martinez, supra, 49 Cal.4th at p. 69.*) We therefore decline to apply the ABC test.

3. Curry *and* Henderson

We do not conduct our analysis in a vacuum. Two prior courts have examined this question as it applies to Shell and its gas stations, and both concluded Shell was not a joint employer as a matter of law. The trial court correctly concluded that, at least on purely legal issues, it was bound by *Curry* and *Henderson*. But as discussed below, we conclude we disagree with the *Curry* and *Henderson* courts on certain points, and on others we conclude the evidence in the present case may differ from the evidence in *Curry* and *Henderson*.

In *Curry*, the court concluded the MSO operator, not Shell, controlled the plaintiff's hours and wages because the MSO operator "'was responsible for hiring, firing, disciplining, training, **[*14]** and compensating'" the plaintiff, and "'alone determined that [the plaintiff] would be deemed an exempt employee, at which station(s) [the plaintiff] would work, when she would work and what compensation and health and welfare benefits she should receive.'" (*Curry, supra, 23 Cal.App.5th at pp. 302–303*.) The court also concluded the MSO operator, not Shell, controlled the plaintiff's working conditions because the MSO operator "'maintained the right and ability to assign any employee' to perform tasks" and "'maintained control over the daily work of its own employees.'" (*Id. at p. 303*.)

The *Curry* court rejected the plaintiff's argument that Shell controlled the plaintiff's working conditions through

the MSO operator, noting "[the plaintiff's] argument reflects Shell exercised control over [the MSO operator], and, in turn, [the MSO operator] exercised control over [the plaintiff], but [the plaintiff] has not explained how Shell exercised control over [the plaintiff's] wages, hours, or working conditions." (*Curry, supra, 23 Cal.App.5th at p. 303*.) The *Curry* court rejected the plaintiff's argument about control over her hours for similar reasons: "[the plaintiff] fails to explain how Shell exercised control over [the plaintiff], as opposed to [the MSO operator]. As explained *ante* [*15], if [the MSO operator] staffed the gas station with five employees a shift, such that the various required tasks were completed by a variety of people, there is no evidence indicating Shell would have been authorized to change such an arrangement." (*Id. at pp. 303–304*.)

The *Curry* court also rejected the plaintiff's argument about control over her wages: "[the plaintiff] points to evidence that Shell was required to reimburse [the MSO operator] for the reasonable expenses related to [the MSO operators] maintaining the fueling station. Shell unilaterally determined what amount was reasonable. This evidence does not reflect that [the plaintiff's] wages were affected by the reimbursement. For example, it does not reflect [the plaintiff] was paid less for a shift if the reimbursement amount was lower than [the MSO operator] expected." (*Curry, supra, 23 Cal.App.5th at p. 304*.)

The *Curry* court applied a similar analysis to the "suffer or permit to work" definition of employment. The court relied on the MSO operator's contractual responsibility for hiring, firing, disciplining, training, compensating, and maintaining payroll records for its employees, and concluded "Shell did not acquiesce to [the plaintiff's] employment because Shell was not in [*16] a position to terminate [the plaintiff] or hire a different person to perform the tasks [the plaintiff] performed." (*Curry, supra, 23 Cal.App.5th at p. 311*.) The *Curry* court discounted Shell's failure to exercise its contractual authority to remove the plaintiff from Shell's stations as "suffering by a failure to hinder" because the authority was conditioned upon "'good cause shown,'" which the court concluded was not present. (*Ibid.*)

In addition, though the *Curry* court held the ABC test does not apply in the joint employer context, it nevertheless applied the ABC test and concluded Shell was not an employer under that test. (*Curry, supra, 23 Cal.App.5th at pp. 314–315*.) In so doing, the *Curry* court wrote the plaintiff "was engaged in the distinct occupation of an [MSO operator] station manager," which "'involved operating gas stations,'" which the court concluded was distinct from Shell's business of "'owning real estate and fuel.'" (*Id. at p. 315*.)

The *Henderson* court followed the *Curry* court on most of these issues, citing *Curry* extensively. (*Henderson, supra, 40 Cal.App.5th at p. 1121*.) Like the *Curry* court, the *Henderson* court concluded Shell had not established "good cause" to remove the plaintiff from the station, and therefore had no power to hinder the plaintiff's work. (*Id. at p. 1122*.) The *Henderson* court disagreed with [*17] the *Curry* court on one point: the *Henderson* court concluded Shell, the plaintiff, and the MSO operators were in the same business, namely, "the business of furnishing and selling fuel to retail customers." (*Henderson, at p. 1129, fn. 8*.)

4. *Applying the Law to this Case*

There are certain features of the facts and evidence in this case that appear to differ from those presented to the courts in *Curry* and *Henderson*. The evidence offered in this case by plaintiff that Shell employees told him they had the power to fire him, or to have him fired, does not appear in the *Curry* or *Henderson* opinions. Nor do the *Curry* or *Henderson* opinions discuss the flow of payments for fuel (direct to Shell) or Shell's contractually-mandated control over the MSO operators' bank accounts. Last, the *Curry* and *Henderson* opinions do not discuss Shell's ability to add or remove individual stations to and from MSO operator clusters at any time, for any reason.

We find these factual distinctions significant. The *Curry* and *Henderson* opinions both turn on the conclusion that the plaintiffs could not provide evidence of Shell's authority to hire or fire the plaintiff, but the plaintiff in this case has provided such evidence: his testimony regarding [*18] Shell trainers both threatening to fire him and claiming they had caused other MSO operator employees to be fired. The payment flow evidence is also significant in showing the degree of control Shell had over its MSO operators, and in showing the nature of Shell's business. And Shell's ability to add or remove individual stations to and from MSO operator clusters shows a method through which Shell had the ability to prevent plaintiff from working in Shell's business, which relates to the "suffer or permit to work" test.

In addition to these factual distinctions, we note several points of disagreement between our analysis and the *Curry* and *Henderson* opinions. First, the *Curry* and *Henderson* courts concluded Shell did not control the employees' hours, wages, or working conditions largely

because Shell only exercised control over the MSO operator and did not directly control the employees themselves. We disagree. The relevant wage order provision defines an "employer" as "any person … who *directly or*

*indirectly, or through an agent or any other person*, employs or exercises control over the wages, hours, or working conditions of any person." (*Cal. Code Regs., tit. 8, §§ 11070, subd. 2(F)*, italics added.) Thus, a person can be a **[*19]** joint employer without exercising direct control over the employee. If the putative joint employer instead exercises enough control over the intermediary entity to indirectly dictate the wages, hours, or working conditions of the employee, that is a sufficient showing of joint employment.

The undisputed facts in this case are more than sufficient to support such a finding. Shell provided extremely detailed technical instructions for managing their stations, and deviations from these standards were prohibited. Plaintiff was even threatened with termination by a Shell employee for an alleged violation of these standards. Another Shell employee told plaintiff at training she had fired "many" MSO operator managers for violating these policies.

And Shell's system of unilaterally setting reimbursements for labor costs while mandating hours of operation for their stations had the practical effect of controlling plaintiff's wages. R&M could not achieve labor cost savings by closing the stations during less productive periods (which might have allowed them to pay plaintiff more per hour). Nor could R&M reduce the workload on their stations' operators by changing the way the stations operate (and **[*20]** thus reduce overall staffing), because the task the employees performed were rigidly controlled by Shell. The only way R&M could pay plaintiff more than the reimbursement rate is by losing money.

Second, the *Curry* and *Henderson* courts concluded Shell did not "suffer or permit" the employees to work because Shell lacked the power to fire the employees, and Shell could not exercise its contractual right to remove them due to a lack of "good cause shown." Again, we disagree. The "suffer or permit" test necessarily includes situations in which the joint employer lacks the power to fire the employee.

The example cited by the *Curry* court itself illustrates the point well. "[C]oal miners paid a boy to carry water for them and the boy sustained injuries while working." (*Curry, supra, 23 Cal.App.5th at p. 311*.) The boy was deemed an employee of the mining company because the company failed to prevent him from working in its business. (*Ibid.*) The mining company, being a nonparty to the contract, lacked the legal authority to terminate the employment relationship between the coal miners and the boy. But the company had the practical ability to prevent the boy from working by barring him from the premises, which was sufficient to trigger **[*21]** the "suffer or permit to work" definition.

Here, Shell could have stopped plaintiff from working in their stations through a variety of means. Unlike the *Curry* and *Henderson* courts, we conclude Shell could indeed have invoked its contractual ability to remove employees from a particular station. The "good cause shown" was the MSO operator's failure to comply with California's wage and hour laws in compensating that employee. Or Shell could have simply removed the station (or all its stations) from the MSO operator's cluster, replacing them with another MSO operator with different employees. As discussed above, Shell had the power to do so at any time, for any reason. And it is evident from Shell's strict control over its stations and the statements and threats of Shell's employees to plaintiff that Shell also had the practical power to cause its MSO operators, who were essentially at Shell's mercy, to terminate any particular employee.

We find Shell's arguments to the contrary unpersuasive. Shell largely relies on the *Curry* and *Henderson* opinions, which we discuss above. Shell also argues the policy considerations underlying *Dynamex* and the ABC test (principally, ensuring workers are **[*22]** paid minimum wage in compliance with California law) do not apply in the joint employer context, where the employee already has recourse for alleged wage and hour violations against the primary employer. Presumably, this argument would also militate in favor of a narrow reading of the relevant tests in the joint employer context. Of course, we are not free to depart from the tests prescribed by the Supreme Court in *Martinez*, but to the extent Shell argues for a narrower reading of *Martinez* and the underlying wage orders, this argument has some practical appeal. For wage and hour plaintiffs, the joint employer question only makes a material difference in their recovery when the primary employer is unable to pay (likely due to insolvency). In most cases, it may well be a purely academic question.

But the same is true for Shell: joint employer status only affects Shell when its MSO operator is unable to pay its employees. Shell's MSO contracts contain an indemnity provision requiring the MSO operator to defend and

indemnify Shell if Shell is ever sued by the MSO operator's employees for labor violations. If an MSO operator is reachable by a judgment, it ultimately answers for any labor [*23] violations alleged by its employees, whether asserted against Shell as joint employer or directly against the MSO operator, and Shell pays nothing.

So in a practical sense, the question put to us by this appeal is this: who should bear the risk of an MSO operator's inability to pay its employees' wages—Shell or the employees themselves? We conclude it should be Shell's risk to bear, given Shell's near-complete control over the MSO operators' finances, day-to-day operations, facilities, and practices.

**DISPOSITION**

The judgment is reversed.

Plaintiff shall recover costs on appeal.

Bedsworth, Acting P. J., and Moore, J., concurred.

---

End of Document