DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S
STATEMENT OF RECENT DECISION
[N.D. CAL. CIV. L.R. 7 3(d)(2)]

**Exhibit A**

 (b) The parties offer two competing definitions of the relevant "class of workers" to which Saxon belongs. Southwest says that the class includes all airline employees carrying out the "customary work" of the airline. Saxon, meanwhile, focuses on the specific tasks she frequently performs. The Court rejects Southwest's definition, which is inconsistent with the FAA's text. Section 1 refers to "workers" not "employees" or "workforces," thus directing the interpreter's attention to "the performance of work." *New Prime Inc.* v. *Oliveira,* 586 U. S. ___, ___. Further, the word "engaged" similarly emphasizes the actual work that the members of the class, as a whole, typically carry out. Saxon is therefore a member of a "class of workers" based on what she frequently does at Southwest—physically loading and unloading cargo on and off airplanes. The Court also rejects Saxon's attempt to define the relevant class of workers by her own conduct, as §1 requires consideration of the entire "class of workers" and not just the individual worker. Pp. 3–5.

 (c) Airplane cargo loaders, as a class, are "engaged in foreign or interstate commerce" under §1. Section 1's exempted "class of workers" must at least play a direct and "necessary role in the free flow of goods" across borders. *Circuit City Stores, Inc.* v. *Adams,* 532 U. S. 105, 121. That is, a class of workers must be actively "engaged in transportation" of those goods across borders via the channels of foreign or interstate commerce. *Id.,* at 118. Cargo loaders exhibit this central feature of a transportation worker. One who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (*e.g.*, transportation) of that cargo. Indeed, the Court said nearly 100 years ago that "[l]oading and unloading" interstate shipments of cargo by "employees of a carrier" was so closely related to interstate commerce as to be practically a part of it. *Baltimore & Ohio S. W. R. Co.* v. *Burtch,* 263 U. S. 540, 544. Pp. 5–7.

 (d) Southwest's two arguments to the contrary are unpersuasive. First, Southwest presses a broader definition of the relevant "class of workers," arguing that because airline employees as a whole are engaged in interstate commerce, any class of airline employees—including ramp supervisors—is necessarily "engaged" in such commerce. But §1 requires a more focused inquiry that asks whether the specific "class of workers" at issue is itself engaged in foreign or interstate commerce. Second, Southwest invokes the FAA's "proarbitration purposes" to argue that §1's exemption should be construed narrowly. But the Court is not "free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal." *New Prime,* 586 U. S., at ___. Pp. 7–11.

 993 F. 3d 492, affirmed.

 THOMAS, J., delivered the opinion of the Court, in which all other Members joined, except BARRETT, J., who took no part in the consideration or decision of the case.

   (1) The parties dispute how to define the relevant "class of workers." Saxon argues that because the air transportation industry engages in interstate commerce, airline employees, as a whole, constitute a "class of workers" covered by §1. By contrast, Southwest maintains that the relevant class includes only those airline employees actually engaged day-to-day in interstate commerce. This Court rejects Saxon's industrywide approach. By referring to "workers" rather than "employees," the FAA directs attention to "the *performance* of work." *New Prime Inc.* v. *Oliveira,* 586 U. S. \_\_\_, \_\_\_. And the word "engaged" similarly emphasizes the actual work that class members typically carry out. Saxon is therefore a member of a "class of workers" based on what she frequently does at Southwest—that is, physically loading and unloading cargo on and off airplanes—and not on what Southwest does generally. Pp. 3–4.

   (2) The parties also dispute whether the class of airplane cargo loaders is "engaged in foreign or interstate commerce." It is. To be "engaged" in "commerce" means to be directly involved in transporting goods across state or international borders. Thus, any class of workers so engaged falls within §1's exemption. Airplane cargo loaders are such a class.

  Context confirms this reading. In *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, the Court applied two well-settled canons of statutory interpretation to hold that §1 exempted only "transportation workers," rather than all employees. The Court indicated that any such exempted worker must at least play a direct and "necessary role in the free flow of goods" across borders. *Id.,* at 121. Cargo loaders exhibit this central feature of a transportation worker.

  A final piece of statutory context further confirms that cargo loading is part of cross-border "commerce." Section 1 of the FAA defines exempted "maritime transactions" to include "agreements relating to wharfage . . . or any other matters in foreign commerce." Thus, if an "agreemen[t] relating to wharfage"—*i.e.,* money paid to access a cargo-loading facility—is a "matte[r] in foreign commerce," it stands to reason that an individual who actually loads cargo on vehicles traveling across borders is himself engaged in such commerce. Pp. 4–7.

  (b) Both parties proffer arguments disagreeing with this analysis, but none is convincing. Pp. 7–11.

   (1) Saxon thinks the relevant "class of workers" should include all airline employees, not just cargo loaders. For support, she argues that "railroad employees" and "seamen"—two classes of workers listed immediately before §1's catchall provision—refer generally to employees in those industries. Saxon's premise is flawed. "Seamen" is not an industrywide category but instead a subset of workers engaged in the maritime shipping industry. For example, "seamen" did not include

all those employed by companies engaged in maritime shipping when the FAA was enacted. Pp. 8–9.

   (2) Southwest's three counterarguments all fail. First, Southwest narrowly construes §1's catchall category—"any other class of workers engaged in foreign or interstate commerce"—to include only workers who physically transport goods or people across foreign or international boundaries. Southwest relies on the definition of "seamen" as only those "employed on board a vessel," *McDermott Int'l, Inc.* v. *Wilander,* 498 U. S. 337, 346, and argues that the catchall category should be read along the same lines to exclude airline workers, like Saxon, who do not ride aboard an airplane in interstate or foreign transit. But Southwest's acknowledgment that the statute's reference to "railroad employees" is somewhat ambiguous in effect concedes that the three statutory categories in §1—"seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce"—do not share the attribute that Southwest would like read into the catchall provision. Well-settled canons of statutory interpretation neither demand nor permit limiting a broadly worded catchall phrase based on an attribute that inheres in only one of the list's preceding specific terms. Second, Southwest argues that cargo loading is similar to other activities that this Court has found to lack a necessary nexus to interstate commerce in other contexts. But the cases Southwest invokes all addressed activities far more removed from interstate commerce than physically loading cargo directly on and off an airplane headed out of State. See, *e.g., Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S. 186. Finally, Southwest argues that the FAA's "proarbitration purposes" counsel in favor of an interpretation that errs on the side of fewer §1 exemptions. Here, however, plain text suffices to show that airplane cargo loaders, and thus ramp supervisors who frequently load and unload cargo, are exempt from the FAA's scope under §1. Pp. 9–11.

993 F. 3d 492, affirmed.

   THOMAS, J., delivered the opinion of the Court, in which all other Members joined, except BARRETT, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 21–309

## SOUTHWEST AIRLINES CO., PETITIONER *v.* LATRICE SAXON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 6, 2022]

JUSTICE THOMAS delivered the opinion of the Court.

Latrice Saxon works for Southwest Airlines as a ramp supervisor. Her work frequently requires her to load and unload baggage, airmail, and commercial cargo on and off airplanes that travel across the country. The question presented is whether, under §1 of the Federal Arbitration Act, she belongs to a "class of workers engaged in foreign or interstate commerce" that is exempted from the Act's coverage. We hold that she does.

I

Southwest Airlines moves a lot of cargo. In 2019, Southwest carried the baggage of over 162 million passengers to domestic and international destinations. Dept. of Transp., Bureau of Transp. Statistics (BTS), Passengers Southwest Airlines—All Airports (May 2, 2022) (online source archived at www.supremecourt.gov). In total, Southwest transported more than 256 million pounds of passenger, commercial, and mail cargo. BTS, Air Carriers: T–100 Domestic Market (U. S. Carriers) (May 2, 2022) (online source archived at www.supremecourt.gov).

To move that cargo, Southwest employs "ramp agents,"

who physically load and unload baggage, airmail, and freight. It also employs "ramp supervisors," who train and supervise teams of ramp agents. Frequently, ramp supervisors step in to load and unload cargo alongside ramp agents. See 993 F. 3d 492, 494 (CA7 2021).

Saxon is a ramp supervisor for Southwest at Chicago Midway International Airport. As part of her employment contract, she agreed to arbitrate wage disputes individually. Nevertheless, when Saxon came to believe that Southwest was failing to pay proper overtime wages to her and other ramp supervisors, she brought a putative class action against Southwest under the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U. S. C. §201 *et seq.*

Southwest sought to enforce its arbitration agreement with Saxon under the Federal Arbitration Act (FAA), 9 U. S. C. §1 *et seq.*, and moved to dismiss the lawsuit. In response, Saxon invoked §1 of the FAA, which exempts from the statute's ambit "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Saxon argued that ramp supervisors, like seamen and railroad employees, were an exempt "class of workers engaged in foreign or interstate commerce." *Ibid.*

The District Court disagreed, holding that only those involved in "actual transportation," and not the "mer[e] handling [of] goods," fell within the exemption. 2019 WL 4958247, \*7 (ND Ill., Oct. 8, 2019). The Court of Appeals reversed. It held that "[t]he act of loading cargo onto a vehicle to be transported interstate is itself commerce, as that term was understood at the time of the [FAA's] enactment in 1925." 993 F. 3d, at 494. Citing Saxon's "uncontroverted declaration" that ramp supervisors at Midway "frequently" load and unload cargo, the Court of Appeals reserved the question "whether supervision of cargo loading alone" would also fall within the FAA's §1 exemption. *Id.*, at 494, 497.

The Seventh Circuit's decision conflicted with an earlier decision of the Fifth Circuit. See *Eastus* v. *ISS Facility Services, Inc.*, 960 F. 3d 207 (2020). We granted certiorari to resolve the disagreement. 595 U. S. \_\_\_ (2021).

II

In this case, we must decide whether Saxon falls within a "class of workers engaged in foreign or interstate commerce." 9 U. S. C. §1. We interpret this language according to its "'ordinary, contemporary, common meaning.'" *Sandifer* v. *United States Steel Corp.*, 571 U. S. 220, 227 (2014) (quoting *Perrin* v. *United States*, 444 U. S. 37, 42 (1979)); see also *New Prime Inc.* v. *Oliveira*, 586 U. S. \_\_\_, \_\_\_–\_\_\_ (2019) (slip op., at 6–7). To discern that ordinary meaning, those words "'must be read'" and interpreted "'in their context,'" not in isolation. *Parker Drilling Management Services, Ltd.* v. *Newton*, 587 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 5) (quoting *Roberts* v. *Sea-Land Services, Inc.*, 566 U. S. 93, 101 (2012)).

We begin by defining the relevant "class of workers" to which Saxon belongs. Then, we determine whether that class of workers is "engaged in foreign or interstate commerce."

A

First, the parties dispute how to define the relevant "class of workers." Saxon argues that because air transportation "[a]s an industry" is engaged in interstate commerce, "airline employees" constitute a "'class of workers'" covered by §1. Brief for Respondent 17. Southwest, by contrast, maintains that §1 "exempts classes of workers based on *their* conduct, not their *employer's*," and the relevant class therefore includes only those airline employees who are actually engaged in interstate commerce in their day-to-day work. Reply Brief 4. The Court of Appeals rejected Saxon's industrywide approach, see 993 F. 3d, at 497, and so do we.

 As we have observed before, the FAA speaks of "'workers,'" not "'employees' or 'servants.'" *New Prime*, 586 U. S., at \_\_\_–\_\_\_ (slip op., at 9–10). The word "workers" directs the interpreter's attention to "the *performance* of work." *Id.*, at \_\_\_ (slip op., at 10) (emphasis altered); see also Webster's New International Dictionary 2350 (1922) (Webster's) (worker: "One that works"); Funk & Wagnall's New Standard Dictionary 2731 (1913) (worker: "One who or that which performs work"). Further, the word "engaged"—meaning "[o]ccupied," "employed," or "[i]nvolved," Webster's 725; see also, *e.g.*, Black's Law Dictionary 661 (3d ed. 1933) (defining "engage")—similarly emphasizes the actual work that the members of the class, as a whole, typically carry out. Saxon is therefore a member of a "class of workers" based on what she does at Southwest, not what Southwest does generally.

 On that point, Southwest has not meaningfully contested that ramp supervisors like Saxon frequently load and unload cargo. See 993 F. 3d, at 494, 497 (noting Saxon's "uncontroverted declaration assert[ing] that she and the other ramp supervisors . . . frequently fill in as ramp agents" for up to three shifts per week). Thus, as relevant here, we accept that Saxon belongs to a class of workers who physically load and unload cargo on and off airplanes on a frequent basis.[1]

B

 Second, the parties dispute whether that class of airplane cargo loaders is "engaged in foreign or interstate commerce" under §1. We hold that it is.

 As always, we begin with the text. Again, to be "engaged" in something means to be "occupied," "employed," or "involved" in it. "Commerce," meanwhile, includes, among other things, "the transportation of . . . goods, both by land

───────────

 [1] Like the Seventh Circuit, we "need not consider . . . whether supervision of cargo loading alone would suffice" to exempt a class of workers under §1. 993 F. 3d 492, 497 (2021).

and by sea." Black's Law Dictionary 220 (2d ed. 1910) (Black's); see also, *e.g.,* Webster's 448 (commerce: "the exchange of merchandise on a large scale between different places or communities"). Thus, any class of workers directly involved in transporting goods across state or international borders falls within §1's exemption.

Airplane cargo loaders are such a class. We have said that it is "too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it." *Baltimore & Ohio Southwestern R. Co.* v. *Burtch*, 263 U. S. 540, 544 (1924). We think it equally plain that airline employees who physically load and unload cargo on and off planes traveling in interstate commerce are, as a practical matter, part of the interstate transportation of goods. They form "a class of workers engaged in foreign or interstate commerce."[2]

Context confirms this reading. In *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105 (2001), we considered whether §1 exempts all employment contracts or only those contracts involving "transportation workers." *Id.,* at 109. In concluding that §1 exempts only transportation-worker contracts, we relied on two well-settled canons of statutory interpretation. First, we applied the meaningful-variation canon. See, *e.g.*, A. Scalia & B. Garner, Reading Law 170 (2012) ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is

---

[2] We recognize that the answer will not always be so plain when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders. Compare, *e.g., Rittmann* v. *Amazon.com, Inc.*, 971 F. 3d 904, 915 (CA9 2020) (holding that a class of "last leg" delivery drivers falls within §1's exemption), with, *e.g., Wallace* v. *Grubhub Holdings, Inc.*, 970 F. 3d 798, 803 (CA7 2020) (holding that food delivery drivers do not). In any event, we need not address those questions to resolve this case.

that the different term denotes a different idea"). We observed that Congress used "more open-ended formulations" like "'affecting'" or "'involving'" commerce to signal "congressional intent to regulate to the outer limits of authority under the Commerce Clause." *Circuit City*, 532 U. S*.,* at 115–116, 118. By contrast, Congress used a "narrower" phrase—"'engaged in commerce'"—when it wanted to regulate short of those limits. *Id.,* at 118. Second, we applied the *ejusdem generis* canon, which instructs courts to interpret a "general or collective term" at the end of a list of specific items in light of any "common attribute[s]" shared by the specific items. *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 225 (2008). As applied to §1, that canon counseled that the phrase "'class of workers engaged in . . . commerce'" should be "controlled and defined by reference" to the specific classes of "'seamen'" and "'railroad employees'" that precede it. *Circuit City*, 532 U. S., at 115.

Taken together, these canons showed that §1 exempted only contracts with transportation workers, rather than all employees, from the FAA. See *id.,* at 119. And, while we did not provide a complete definition of "transportation worker," we indicated that any such worker must at least play a direct and "necessary role in the free flow of goods" across borders. *Id.,* at 121. Put another way, transportation workers must be actively "engaged in transportation" of those goods across borders via the channels of foreign or interstate commerce. *Ibid*.

Cargo loaders exhibit this central feature of a transportation worker. As stated above, one who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (*e.g.,* transportation) of that cargo. "[T]here could be no doubt that [interstate] transportation [is] still in progress," and that a worker is engaged in that transportation, when she is "doing the work of unloading" or loading cargo from a vehicle carrying goods in interstate transit. *Erie R. Co.* v. *Shuart*, 250 U. S. 465, 468 (1919).

A final piece of statutory context further confirms that cargo loading is part of cross-border "commerce." The first sentence of §1 of the FAA defines exempted "maritime transactions" to include, among other things, "agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any *other* matters in foreign commerce." (Emphasis added.) The use of "other" in the catchall provision indicates that Congress considered the preceding items to be "matters in foreign commerce." And agreements related to the enumerated "matte[r] in foreign commerce" of "wharfage," to take one example, included agreements for mere access to a wharf—which is simply a cargo-loading facility. See Black's 1226 (wharfage: "[m]oney paid for landing wares at a wharf, or for shipping or taking goods into a boat or barge from thence"); Webster's 2323 (similar); see also, *e.g.,* Black's 1226 (wharf: "A perpendicular bank or mound . . . extending some distance into the water, for the convenience of lading and unlading ships and other vessels"). It stands to reason, then, that if payments to access a cargo-loading facility relate to a "matte[r] in foreign commerce," then an individual who actually loads cargo on foreign-bound ships docked along a wharf is himself engaged in such commerce. Likewise, any class of workers that loads or unloads cargo on or off airplanes bound for a different State or country is "engaged in foreign or interstate commerce."

In sum, text and context point to the same place: Workers, like Saxon, who load cargo on and off airplanes belong to a "class of workers in foreign or interstate commerce."

III

Both Saxon and Southwest proffer arguments that disagree with portions of our analysis. Neither of them convinces us to change course.

A

For her part, Saxon thinks that we should define the

"class of workers" as all airline employees who carry out the "customary work" of the airline, rather than cargo loaders more specifically. Tr. of Oral Arg. 56. That larger class of employees potentially includes everyone from cargo loaders to shift schedulers to those who design Southwest's website. See *id.,* at 51–52; but cf. *ibid.* (conceding that those who run the Southwest credit-card points program likely would not count).

To support this reading, Saxon invokes the *ejusdem generis* canon. She argues, first, that "railroad employees" and "seamen" refer generally to employees in those industries providing "dominant mode[s] of transportation" in interstate and foreign commerce. Brief for Respondent 17. She then reasons, second, that all "workers who do the work of the airlines have the same relationship to commerce as those who do the work of the railroad or ship." *Ibid.*

Saxon's attempted invocation of *ejusdem generis* is unavailing because it proceeds from the flawed premise that "seamen" and "railroad employees" are both industrywide categories. The statute's use of "seamen" shows why that premise is mistaken. In 1925, seamen did not include all those employed by companies engaged in maritime shipping. Rather, seamen were only those "whose occupation [was] to assist in the management of ships at sea; a mariner; a sailor; . . . any person (except masters, pilots, and apprentices duly indentured and registered) employed or engaged in any capacity on board any ship." Webster's 1906; see also, *e.g.,* Black's 1063 (seamen: "[s]ailors; mariners; persons whose business is navigating ships").

Because "seamen" includes only those who work on board a vessel, they constitute a subset of workers engaged in the maritime shipping industry. Regardless of whether "railroad employees" include all rail-transportation workers, the narrow definition of "seamen" shows that the two terms cannot share a "common attribute" of identifying transportation workers on an industrywide basis. *Ali*, 552 U. S., at

224. We therefore reject Saxon's argument that §1 exempts virtually all employees of major transportation providers.

B

While Saxon defines the relevant class of workers too broadly, Southwest construes §1's catchall category—"any other class of workers engaged in foreign or interstate commerce"—too narrowly. The airline argues that only workers who physically move goods or people across foreign or international boundaries—pilots, ship crews, locomotive engineers, and the like—are "engaged in foreign or interstate commerce." So construed, §1 does not exempt cargo loaders because they do not physically accompany freight across state or international boundaries.

Southwest's reading rests on three arguments. None persuades us. First, taking its turn with *ejusdem generis*, the airline argues that because "seamen" are "employed *on board* a vessel," *McDermott Int'l, Inc.* v. *Wilander*, 498 U. S. 337, 346 (1991) (emphasis added), and "'railroad employees' is somewhat ambiguous," Brief for Petitioner 26, we should limit the exempted class of railroad employees to those who are physically on board a locomotive as it crosses state lines. Then, having limited railroad employees in that way, Southwest likewise urges us to narrow §1's catchall provision to exclude those airline-transportation workers, like Saxon and other cargo loaders, who do not ride aboard an airplane in interstate or foreign transit.

Southwest's application of *ejusdem generis* is as flawed as Saxon's. It purports to import a limitation from the definition of "seamen" into the definition of "railroad employees" and then engrafts that limit onto the catchall provision. But by conceding that "railroad employees" is ambiguous, Southwest sinks its own *ejusdem generis* argument. Again, the "inference embodied in *ejusdem generis* [is] that Congress remained focused on [some] common attribute" shared by the preceding list of specific items "when it used

the catchall phrase." *Ali*, 552 U. S., at 225. By recognizing that the term "railroad employees" is at most ambiguous, Southwest in effect concedes that it does not necessarily share the attribute that Southwest would like us to read into the catchall provision. *Ejusdem generis* neither demands nor permits that we limit a broadly worded catchall phrase based on an attribute that inheres in only one of the list's preceding specific terms.

Second, Southwest argues that cargo loading is similar to other activities that this Court has found to lack a necessary nexus to interstate commerce in other contexts. But the cases Southwest invokes all addressed activities far more removed from interstate commerce than physically loading cargo directly on and off an airplane headed out of State. In *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. 186 (1974), for instance, this Court held that a firm making intrastate sales of asphalt was not "engaged in [interstate] commerce," *id.,* at 194 (internal quotation marks omitted), merely because the asphalt was later used to make interstate highways, *id*. at 198. Being only "perceptibly connected to . . . instrumentalities" of interstate commerce was not enough. *Ibid*. Similarly, in *United States* v. *American Building Maintenance Industries*, 422 U. S. 271 (1975), this Court held that "simply supplying localized [janitorial] services to a corporation engaged in interstate commerce does not satisfy the 'in commerce' requirement" in §7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. §18. 422 U. S., at 283. In each case, the Court explained that the relevant firm was not "engaged in" interstate commerce because it did not perform "activities within the flow of interstate commerce." *Id*. at 276 (internal quotation marks omitted); *Gulf Oil*, 419 U. S., at 195.

But unlike those who sell asphalt for intrastate construction or those who clean up after corporate employees, our case law makes clear that airplane cargo loaders plainly do perform "activities within the flow of interstate commerce"

when they handle goods traveling in interstate and foreign commerce, either to load them for air travel or to unload them when they arrive. See *Burtch*, 263 U. S., at 544.

Third, Southwest falls back on statutory purpose. It observes that §2 of the FAA broadly requires courts to enforce arbitration agreements in any "contract evidencing a transaction involving commerce," while §1 provides only a narrower exemption. This structure, in its view, demonstrates the FAA's "proarbitration purposes" and counsels in favor of an interpretation that errs on the side of fewer §1 exemptions. Brief for Petitioner 16, 30–33.

To be sure, we have relied on statutory purpose to inform our interpretation of the FAA when that "purpose is readily apparent from the FAA's text." *AT&T Mobility LLC* v. *Concepcion*, 563 U. S. 333, 344 (2011). But we are not "free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal." *New Prime*, 586 U. S., at \_\_\_ (slip op., at 14). Here, §1's plain text suffices to show that airplane cargo loaders are exempt from the FAA's scope, and we have no warrant to elevate vague invocations of statutory purpose over the words Congress chose.

\*   \*   \*

Latrice Saxon frequently loads and unloads cargo on and off airplanes that travel in interstate commerce. She therefore belongs to a "class of workers engaged in foreign or interstate commerce" to which §1's exemption applies. Accordingly, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE BARRETT took no part in the consideration or decision of this case.